UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

DION MCINTOSH,                                          :

                     Petitioner,          :

        - against -                        :

JAMES CONWAY, Superintendent            :
Attica Correctional Facility, and
ANDREW M. CUOMO, New York State         :
Attorney General,

                                :

                 Respondents.         :
------------------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
PAUL G. GARDEPHE**

10 Civ. 175 (PGG) (FM)

**FRANK MAAS**, United States Magistrate Judge.

        Petitioner Dion McIntosh ("McIntosh") brings this habeas proceeding

pursuant to 28 U.S.C. § 2254 ("Section 2254") to challenge his conviction following a

jury trial in Supreme Court, Bronx County, on one count each of kidnapping in the first

degree, attempted murder in the first degree, attempted assault in the second degree, and

criminal possession of a weapon in the second degree.  On July 8, 2002, Justice Martin

Marcus, before whom the case was tried, sentenced McIntosh to prison terms which, in

the aggregate, amount to a sentence of twenty-five years to life.

        McIntosh was represented in connection with his direct appeal by the Legal

Aid Society ("LAS"), which continues to represent him in this proceeding.  In its habeas

petition on his behalf (ECF No. 2) ("Pet." or "Petition"), the LAS contends that the

prosecution violated its duty to obtain and disclose a "favorable sexual assault lab report"

and that he was denied the effective assistance of counsel for this and other reasons.  (See Pet. ¶ 12).  As set forth below, the Petition should be denied.

I.    Background

    A.    Trial

        1.    People's Case

The evidence at trial, viewed in the light most favorable to the People, established as follows:

On May 19, 2001, at approximately 8:30 p.m., "Cindy,"[1] a sixteen-year-old girl, was selling marijuana on a street in Bridgeport, Connecticut.  (Tr. 258, 260-61).[2] Two strangers, later identified as McIntosh and his cousin Michael Richards ("Richards"), called out to her from an SUV to ask whether she knew the location of a nightclub.  (Id. at 263-64, 545).  Cindy was familiar with the street where the club was located and entered their vehicle to direct them there.  (Id. at 265-66).

When the group arrived at the club, Richards left the vehicle.  McIntosh then joined Cindy in the backseat and asked her several questions.  (Id. at 267-68).

_____

[1]    Cindy's full name appears in the trial record and McIntosh's legal memoranda. In keeping with Section 50(b)(1) of the New York Civil Rights Law, the respondent's papers use only her first name.  I have adopted the same procedure to protect her privacy.

[2]    "Tr." refers to the trial transcript.  "H." refers to the transcript of the post-trial hearing on January 5, 2006.  "Ex." refers to the exhibits annexed to the Declaration of Assistant District Attorney Christopher J. Blira-Koessler, dated May 13, 2010.  (ECF No. 7).  "Dille Affirm." refers to the Affirmation of Ellen Dille, Esq., dated Nov. 23, 2004.  (Ex. 1).  "Pet'r's Mem." refers to McIntosh's Memorandum of Law.  (ECF No. 3).  "Resp't's Mem." refers to the Respondent's Memorandum of Law appended to Mr. Blira-Koessler's Declaration.  "Reply Mem." refers to the Petitioner's Reply Memorandum of Law.  (ECF No. 8).  "A." refers to the Appendix submitted by McIntosh with his Memorandum of Law.

Although Cindy felt uncomfortable, she responded that she was seventeen years old, had a "friend" but not a boyfriend, and was sexually active.  (Id. at 268-69).  Cindy declined McIntosh's subsequent offer of money in exchange for sex and tried to exit the vehicle, but could not because the rear doors were equipped with child safety locks.  (Id. at 270-71).  At that point, McIntosh brandished a gun and forced Cindy to have sex with him.  (Id. at 272-74).  McIntosh used a condom which he later discarded inside the SUV.  (Id. at 275-76).

At approximately 9:15 p.m., Richards returned to the SUV and began to drive away.  (Id. at 276-77).  As Richards drove, McIntosh instructed Cindy to have sex with him again and threatened to kill her if she refused.  (Id. at 277).  This time, McIntosh did not use a condom.  (Id. at 277-78).  He also compelled Cindy to perform oral sex.  (Id. at 278).

After Richards again left the vehicle, McIntosh drove away with Cindy still in the back seat.  (Id. at 279).  At around 10:45 p.m., McIntosh stopped at a parking lot in the vicinity of Greenwich, Connecticut, where he had unprotected sex with Cindy while holding a gun to her head.  (Id. at 279-81).  At one point, McIntosh began choking Cindy with his hands because she was crying.  (Id. at 281).  He later fell asleep in the rear seat while Cindy sat next to the window.  (Id. at 282).

Around 6 a.m. the following morning, McIntosh drove to New York, where he stopped to buy gas and several other items, including "blunts" that Cindy had

requested so that she could smoke marijuana in an effort to calm herself.  (Id. at 284-85, 333-34).  McIntosh was using cocaine throughout their encounter.  (Id. at 286).

McIntosh eventually brought Cindy to his mother's house in Mount Vernon, New York, where he introduced an older male as his brother.  (Id. at 290, 440-41).  While she was there, Cindy took a long shower because McIntosh had made her "feel dirty."  (Id. at 292).  She repeatedly asked McIntosh to allow her to leave, promising that she would not report him to the police, but McIntosh refused.  (Id. at 293).

At approximately 7 p.m., McIntosh and Cindy returned to his SUV.  Once inside, McIntosh struck Cindy on her right forehead with his gun, causing her to lose consciousness.  (Id. at 297-99).  When she later returned to consciousness briefly, McIntosh was choking her neck with a rope or string.  (Id. at 299).  Cindy next awoke in a hospital.  (Id. at 300).

The events that led to Cindy being taken to the hospital began to unfold at approximately 10:40 p.m. on May 20.  (Id. at 153).  At that time, Sergeant William Grosskopf ("Sgt. Grosskopf") of the Pelham Manor Police Department observed McIntosh's SUV in an empty shopping center parking lot in the Bronx.  The vehicle's alarm had activated, setting off flashing lights and a horn.  (Id. at 154-55).  As Sgt. Grosskopf approached in his patrol car, he saw McIntosh standing beside the SUV.  (Id. at 155-56).  McIntosh walked in Sgt. Grosskopf's direction, then suddenly pulled out a gun, fired a shot at the patrol car from a distance of approximately fifteen feet, and turned to flee.  (Id. at 155-58, 161).  McIntosh fired more shots at Sgt. Grosskopf's vehicle as he

4

ran.  (Id. at 161-62, 232-33, 237; see id. at 44, 46).  Additional police officers who arrived at the scene eventually apprehended McIntosh, who by that time was submerged in a nearby creek.  (Id. at 88-90).

The police officers subsequently found Cindy in the back of the SUV.  She was dressed only in her underpants, was unconscious and frothing at the mouth, and had a sweatshirt string around her neck.  (Id. at 172-73).  Cindy was transported to Mount Vernon hospital.  Her eyes were bloodshot and swollen; she also had blood speckles and patches around her eyes and cheek bones and a bruised face.  (Id. at 121-23, 183, 304-05).  There was a mark and blood over her right eyebrow where McIntosh had struck her with his gun.  (Id. at 306-07).  Cindy had bitten her tongue while she was choking, which caused it to swell and made it difficult for her to speak or eat.  (Id. at 305).  The ligature around her neck left a scar that remained partially visible at trial a year later.  (Id. at 304-05).

As Dr. Susan Ely ("Dr. Ely") of the Office of the Chief Medical Examiner of the City of New York ("OCME") explained, the "mechanism" causing the "bulk" of Cindy's injuries was "attempted ligature strangulation."  (Id. at 486, 497).  Dr. Ely reached this conclusion based upon the rope burn around Cindy's neck, the petechial hemorrhages around her eyes and cheekbones,[3] and other larger hemorrhages "over the whites of her eyes."  (Id. at 497-98).  Dr. Ely opined that the ligature would have to have

_____

[3]        According to Dr. Ely, petechial hemorrhages are "pinpoint hemorrhages" typically associated with asphyxia.  (Id. at 495-96).

been "forcefully applied" for a "sustained period" to generate the mark found on Cindy's neck.  (Id. at 499).  Dr. Ely further testified that the injury above Cindy's right eyebrow had been caused by "blunt force trauma" that was consistent with her either having been hit on the head by a pistol or having hit an object in the car suddenly after losing consciousness.[4]  (Id. at 510-11, 521-22).

Following McIntosh's arrest, Detective David Rivera ("Det. Rivera") searched the SUV and retrieved, among other items, a black sweatshirt from the cargo area and a used condom from the floor of the left rear passenger area.  (Id. at 380-82, 389).  Although these items were submitted for forensic testing, Det. Rivera testified that he did not know the results.  (Id. at 392-94).  He similarly testified that he did not know whether a search of the SUV for fingerprints had yielded any prints.  (Id. at 394).  Det. Rivera conducted a "crimescope" of the vehicle that failed to disclose the presence of any semen or blood in its interior.  (Id. at 388).

2.    Defense Case

After initially expressing uncertainty, McIntosh eventually decided to testify as the last defense witness.  (See id. at 541, 543).  He also called as witnesses his great-uncle Austin Findlay ("Findlay") and his sixteen-year-old brother Carl McIntosh ("Carl").  (Id. at 438-58, 459-75).  Their testimony, not surprisingly, presented a markedly different version of the  events of May 19 and 20, 2001.

---

[4]    Dr. Ely conceded, however, that if the impact was sufficient to cause Cindy to lose consciousness, she would have expected a contusion to be present, which there was not.  (Id. at 524).

According to McIntosh, after Richards left the SUV following the group's arrival at the club parking lot, he and Cindy smoked marijuana and drank Hennessy together.[5]  (Id. at 546-47).  McIntosh also showed Cindy his gun after it fell out of a bag.  (Id. at 549).  He and Cindy then had consensual sex, during which he used a condom.  (Id. at 547-48).  Their coitus continued even after Richards returned to the car and began to drive, but Cindy did not perform oral sex.  (Id. at 548, 564).

After Richards left the SUV in Bridgeport, McIntosh offered to drop Cindy somewhere before proceeding to his mother's house in Mount Vernon.  (Id. at 550).  Cindy previously had attempted to call someone from McIntosh's phone, but, because that person had not returned the call, asked to accompany McIntosh, explaining that she had run away from home and was being pursued.  (Id. at 550-51).  The two then continued driving to a hotel parking lot in Stamford, Connecticut, where McIntosh waited for a call from his cousin.  While they were waiting, McIntosh and Cindy smoked marijuana and eventually fell asleep, but did not have sex.  (Id. at 551-53).

As they drove to Mount Vernon the following morning, McIntosh stopped once for gas and again at a store where he left Cindy in his unlocked car.  (Id. at 554).  When he and Cindy later arrived at McIntosh's mother's house, Findlay and Carl both were there.  (Id. at 440, 461, 556).  Cindy and Carl then played video games for several hours.  (Id. at 462-63, 556).  While they were doing so, McIntosh left the house to

---

[5]     The police recovered a bottle of Hennessy from the vehicle.  (See Ex. 1 attach. (Crime Scene Unit Supplementary Report dated May 22, 2001, at 2)).

7

purchase some food.  (Id. at 441-42, 462, 556).   At one point, Cindy also took a shower in a bathroom located next to the back door of the house.  (Id. at 442, 458, 463). Throughout her visit to McIntosh's mother's house, Cindy acted "normal" and "calm." (Id. at 442, 471).  She also had no visible injuries.  (Id. at 455-56).

After leaving the house, McIntosh and Cindy again smoked marijuana together in the car.  (Id. at 557).  At Cindy's suggestion, the two also had sex "one last time," but on this occasion Cindy asked that McIntosh choke her with a string to enhance her sexual experience.[6]  (Id. at 558).  As he was complying with this request, Cindy lost consciousness, fell, and hit her head on the carpeted floor of the SUV.  (Id. at 558, 587). McIntosh then drove around in a panic for two and one-half hours, stopping occasionally to see whether Cindy "would come around."  (Id. at 559, 593-99).

McIntosh eventually pulled into a shopping center parking lot, where he exited the vehicle to smoke several cigarettes.  In the course of doing so, he accidentally set off the vehicle's alarm.  (Id. at 559).  McIntosh became hysterical when Sgt. Grosskopf's vehicle approached.  He fired a shot at the tire of Sgt. Grosskopf's vehicle in an effort to stop the car from pursuing him.  As he attempted to flee, he fired his gun three or four more times "up in the air," with no intent to kill the officer.  He then discarded his gun and jumped into a nearby river.  (Id. at 560-61).

---

[6]      On cross-examination, Dr. Ely testified that she was generally familiar with auto erotic asphyxia, a practice in which a person, "invariably a male," deprives his body of oxygen while masturbating in an effort to enhance the sexual experience.  She also testified that she never had heard of a male placing a ligature around a woman's neck to enhance her experience. (Id. at 518-19).

8

B.     Jury Deliberations and Verdict

The jurors considered six charges.  "With respect to the allegation that

[McIntosh] shot at . . .  Sgt. . . . . Grosskopf," they were asked to consider "the crimes of

attempted murder in the first degree and attempted assault in the second degree."  (Id. at

747).  "With respect to the allegation that [McIntosh] strangled Cindy," they were asked

to consider the charges of "attempted murder in the first degree, attempted murder in the

second degree and attempted assault in the second degree."  (Id.).  "With respect to the

allegation that [McIntosh] abducted and restrained" Cindy, they were asked to consider a

"charge of kidnapping in the first degree."  (Id. at 747-48).  Finally, "with respect to the

allegation that [McIntosh] possessed a weapon with intent to use it unlawfully against

another," they were asked to consider the charge of "criminal possession of a weapon in

the second degree."  (Id. at 748).  As Justice Marcus explained to the jurors, to convict

McIntosh on the first degree attempted murder charge related to Cindy, they had to find

that his "intended victim was a witness to a crime committed on a prior occasion" and

that he had acted "for the purpose of preventing the intended victim's testimony."  (Id. at

754).  The Justice further instructed the jurors that the crime of kidnapping in the first

degree required a showing that McIntosh abducted Cindy and restrained her for a period

of more than twelve hours "with the intent to abuse her sexually."  (Id. at 760).

The jury convicted McIntosh on the attempted first degree murder and

kidnapping charges related to Cindy, the attempted assault charge related to Sgt.

Grosskopf, and the weapons possession charge, but acquitted him on the attempted

murder charge related to Sgt. Grosskopf.  (Id. at 819-20).  Because the jury returned a

guilty verdict on the attempted first degree murder charge related to Cindy, it was not

required to consider the lesser-included charges of attempted murder in the second degree

and attempted assault.  (Id. at 757, 759).

C.     Sentencing[7]

When McIntosh appeared for sentencing on July 8, 2002, his counsel made

an oral motion to set aside the kidnapping and attempted murder convictions as against

the weight of the evidence and also as a matter of law.  Counsel argued that the events of

May 19 and 20 constituted an ongoing incident, which failed to satisfy the element of the

attempted witness-elimination murder charge requiring that the crime witnessed by the

victim have been committed on a prior occasion.  Counsel also sought the dismissal of the

kidnapping charge because it required an intent to sexually abuse Cindy, and because

there allegedly was no evidence that McIntosh and Cindy had engaged in any sexual

activity in New York, any such intent could not have continued into New York.  (See

Dille Affirm. ¶ 106).   The court denied the motion, observing that the arguments had not

been raised at trial and, thus, were unpreserved.  (Id. ¶ 108).  Moving to the merits, the

court concluded that whether a crime had been committed on a "prior occasion" was a

jury issue, that the kidnapping had continued in both Connecticut and New York, and that

---

[7]     The minutes of McIntosh's sentencing have not been submitted to the Court.
Nevertheless, what transpired during that proceeding does not seem to be in dispute.

there was "ample evidence" permitting the jury to infer that McIntosh had the requisite intent in New York.  (Id.).

Justice Marcus then sentenced McIntosh to consecutive terms of twenty-five years to life imprisonment on the charge of kidnapping in the first degree, fifteen years to life on the charge of attempted murder in the first degree, and one and one-third to four years on the charge of attempted assault in the second degree, with these sentences to be served concurrently with a five-year sentence on the charge of criminal possession of a weapon in the second degree.  (Id. ¶ 109).

      C.      <u>Subsequent Proceedings and Events</u>

           1.      <u>Toxicology Report</u>

On July 14, 2004, Ellen Dille, Esq. ("Ms. Dille"), McIntosh's LAS counsel, requested that OCME send her a copy of the sexual assault laboratory report relating to McIntosh's case.  The report that OCME supplied ("OCME Report"), dated June 20, 2002, was prepared by criminalist Meredith S. Rosenberg ("Rosenberg").  (Dille Affirm. ¶¶ 157, 160-61 & attach.; A. 21-28, 49).  In the OCME Report, Rosenberg indicated that there was semen on the inside and outside of the used condom collected from the SUV. (A. 51-52).  The DNA on the inside of the condom came from a single donor.  The DNA on the outside of the condom came from that donor, a second male donor, and Cindy.  (Id. 21-28, 51-52).  Additionally, an antigen contained in seminal fluid was found on the anal swab, but "[n]o male DNA was detected."  (Id. at 21, 22, 25).  There also was "[n]o semen . . . on the oral or vaginal swabs taken from Cindy."  (Id. at 22).

3.      <u>Motion to Vacate Judgment</u>

On November 23, 2004, the LAS filed a motion pursuant to Section 440.10 of the New York Criminal Procedure Law ("CPL") in which McIntosh sought to vacate his judgment of conviction on the theory that the OCME Report constituted newly-discovered evidence that the prosecution wrongfully had failed to disclose in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  (Ex. 1).  In that motion, the LAS also contended that McIntosh's retained trial counsel, Barry S. Turner, Esq. ("Mr. Turner"), was ineffective for failing to:  (a) investigate and obtain the OCME Report, (b) familiarize himself with the discovery materials and evidence, and (c) raise certain legal arguments regarding the charges of attempted murder in the first degree and kidnapping in the first degree.  (<u>Id.</u>).

a.      <u>Affirmations and Affidavits</u>

In support of its motion to vacate, the LAS submitted the affirmation of Ms. Dille, a member of its Appeals Bureau, who detailed certain post-trial conversations that she allegedly had with Mr. Turner.  According to Ms. Dille, Mr. Turner acknowledged that he had not received "the results of the rape kit" testing or the tests that the police had performed on items removed from the back of the SUV, nor had he inquired about them.  (Dille Affirm. ¶¶ 142, 146).  Mr. Turner also allegedly indicated that had he known "that the sex assault test results were negative, he would have used them at the trial."  (<u>Id.</u> ¶ 146).   He explained that he trusted the prosecutor and assumed that any negative results would have been provided to him.  (<u>Id.</u> ¶ 146).  Mr. Turner further indicated that

he had been unsuccessful in his attempt to locate an expert to testify about the use of a ligature to enhance the sexual experience.  He conceded that he did not consult with any experts "regarding the physical manifestations of unprotected sexual activity or rape." (Id. ¶ 149).

As part of its opposition to the motion, the People submitted an affidavit from Rosenberg, who explained that "a number of factors . . . can lead to a failure to detect semen inside the vaginal cavity of a subject following sexual intercourse."  (Ex. 2) (Aff. of Meredith Rosenberg, sworn to on Mar. 9, 2005, ¶ 3).  According to Rosenberg, those factors include "a failure on the part of the male subject to ejaculate, the activities of the subject patient following sexual intercourse, the positions in which a subject patient may hold herself during or after sexual intercourse, as well as the passage of time."  (Id.). The People also submitted the prosecutor's affirmation indicating that he did not ask that the rape kit be tested because all of the sexual offenses had occurred in Connecticut and because McIntosh conceded that he had engaged in sexual intercourse with Cindy.  (Ex. 2) (Affirm. of Ass't Distr. Att'y Daniel T. McCarthy, dated Apr. 8, 2005 ("McCarthy Affirm."), ¶ 8).  The prosecutor further averred that he had no knowledge that testing had been performed or of the existence of the OCME Report before McIntosh's appellate counsel requested a copy.  (Id. ¶¶ 8, 11).  Ironically, the prosecutor also represented that if he had received the OCME Report prior to trial, he would have disclosed it – not as Brady material, but in the course of pretrial discovery so that he could have introduced the

findings as part of his case-in-chief to establish that McIntosh's motive for kidnapping Cindy was to abuse her sexually.   (Id. ¶ 10).

The People's opposition papers also included Mr. Turner's affirmation. (Ex. 2).  As Mr. Turner explained, because his "strategy was to concede the allegation of sexual contact on grounds that it was consensual," he saw "no need to investigate the forensic evidence collected by the police."  (Id. at 1).  He further explained that he thought the laboratory results would have no probative value because too much time had elapsed between the alleged unprotected sex and the collection of a sample.  (See id.). Finally, he noted that he had "tried to keep the sexual aspects of the case to a minimum." (Id.).

        b.    Hearing

Justice Marcus held a hearing on January 5, 2006, to determine the effect that the OCME Report "could have had on the verdict."  (A. 32-34, 128).  Rosenberg, called by the defense, was the sole witness.  (Id. at 34-127).  She testified that, as part of an effort to cope with a prior backlog, OCME has tested all sexual assault kits for the New York Police Department since 2000.  (Id. at 40-41).  In this case, OCME received the sexual assault kit and condom from the Police Department in May 2001.  (Id. at 37). Although OCME evidently completed its testing of those items that same year, due to the events of September 11, 2001, Rosenberg did not prepare her written report until June 20, 2002.  (Id. at 37-38, 49, 63).  Furthermore, although such reports generally are faxed to

both the district attorney's office and the detectives working on a case, Rosenberg

confirmed that no such fax had been sent with respect to this case.  (Id. at 47-49).

       Turning to the actual test results, Rosenberg testified that the female DNA

profile on the outside of the condom was consistent with Cindy's DNA.  (Id. at 51-52).

Moreover, although the report did not name the semen donor whose DNA was on the

inside of the condom, Rosenberg explained that the profile was consistent with

McIntosh's DNA, which was on file with a DNA data bank and identification system.

(Id. at 56-57, 79-80, 89).  Rosenberg thus could conclude that there was sexual interaction

between Cindy and McIntosh, but could not say how the DNA was deposited, how many

interactions took place or in what sequence, whether unprotected sex had occurred, or

whether any acts were consensual.  (E.g., id. at 83-86, 92-94, 113-16, 121-23).

       Additionally, although the report referred to the material from a second

male source on the outside of the condom as "semen," Rosenberg testified that, because

of its low concentration, she could not say whether it was semen or some other kind of

cellular material.  (Id. at 76, 79, 81-82).  Assuming it was semen, Rosenberg opined that it

could have been inside Cindy's vaginal cavity one to two days prior to her encounter with

McIntosh; alternatively, the material could have come from the floor of the SUV where

the condom was discarded.  (Id. at 77, 110).

       Rosenberg testified further that the presence of semen on the anal swab

could be explained by either unprotected sex or a spill from the used condom.  (Id. at 57,

83-84).  Cindy's decision to shower also could explain the absence of semen on the

vaginal swabs, even if unprotected sex occurred.  (Id. at 57-58).   Rosenberg noted that

any semen deposited in the mouth is naturally cleansed away in three to six hours;

therefore she would not expect to recover any semen from an oral swab taken, as here,

twenty-four hours after the event.  (Id. at 106-07).

   In sum, Rosenberg was unable to conclude which of counsel's posited

explanations for the test results was more probable; she could only respond that the

results were "not inconsistent" with their hypotheticals.  (E.g., id. at 94, 100-01, 116).

     c.  Denial of CPL § 440.10 Motion

   On March 13, 2006, Justice Marcus handed down a lengthy written decision

in which he denied McIntosh's motion to vacate the judgment of conviction.  (Id. at 128-

60).  The Justice first held that the OCME Report was not "newly discovered" evidence

because McIntosh's defense counsel had failed to seek the test results despite his

awareness that the rape kit and condom existed and had been submitted for DNA testing.

(Id. at 135-36).

   Justice Marcus also addressed whether, if the OCME Report were

considered "newly discovered evidence," its findings "probably" would have affected the

outcome of the trial, had they been introduced.  (Id. at 136).  The Justice concluded that

McIntosh failed to make the requisite showing.  As he explained, McIntosh contended

that he was entitled to a new trial because the test results would have (i) "caused the jury

to disbelieve" Cindy's story, (ii) corroborated his own account, (iii) refuted the

prosecutor's argument that Cindy was given drugs at the hospital because she and

McIntosh had engaged in unprotected sex, and (iv) helped him convince the jury that Cindy had "lied about the consensual nature" of her encounters with McIntosh for "fear of jeopardizing [her preexisting] relationship" with another man.  (Id. at 37).

Addressing the dueling versions of events, Justice Marcus noted that the lack of male DNA on the anal swab was not helpful to McIntosh because neither he nor Cindy had testified that they engaged in anal intercourse.  Further, although P-30, a protein found in seminal fluid, was present on the swab, the Justice concluded that this neither contradicted Cindy's testimony nor corroborated McIntosh's since they "both testified to at least one act of unprotected vaginal intercourse," and Rosenberg testified that semen "could have dripped into [Cindy's] anus after unprotected vaginal intercourse."  (Id. at 138).  Moreover, as the Justice noted, nothing that Rosenberg said suggested that the lack of male DNA on the swab made either account more or less likely.[8]

Justice Marcus concluded that the absence of male DNA on the oral swab similarly did not contradict Cindy's account or corroborate McIntosh's account in light of Rosenberg's testimony that "semen deposited in the mouth could only be retrieved for up to six hours," as much more time had elapsed before Cindy's oral swab was obtained. (Id. at 138-39).

_____

[8]     The Justice also noted that the presence of one allele of DNA foreign to Cindy on the anal swab neither confirmed nor refuted Cindy's testimony regarding unprotected sex with McIntosh since the failure to detect male DNA could have been "explained by the presence of some, but too little, sperm to permit DNA typing, or by an overwhelming amount of female DNA" from Cindy.  (Id.).

Justice Marcus found the absence of any male semen on the vaginal swabs no more exculpatory, noting that there was no testimony that McIntosh ejaculated during any act of unprotected sex with Cindy.  Moreover, even if McIntosh had ejaculated, Rosenberg testified that the successful retrieval of seminal fluid could have been "hampered" by a number of factors, including the passage of time and the fact that Cindy showered before the samples were taken.  As the Justice noted, Rosenberg also testified that she never had encountered or read about a case in which semen remained present in a victim's vagina after she showered.  (Id. at 139-40).

In sum, the Justice concluded that the test results disclosed in the OCME Report were "equally consistent with [Cindy] having engaged in only one act of protected sex[,] or in one act of protected sex and one of unprotected sex, or in more than one act of each, and [that] none of these possibilities was more probable than another."  (Id. at 140).

Justice Marcus also rejected McIntosh's claim that the test results could have neutralized the prosecutor's argument that Cindy was given drugs at the hospital because McIntosh had exposed her to unprotected sex.  As the Justice explained, McIntosh "himself admitted that he had at least one act of (albeit consensual) unprotected sex" with Cindy.  (Id. at 140).  The issue thus "was not whether any unprotected sexual acts occurred, but whether the sexual acts that had occurred had been forcible."  (Id.). Justice Marcus concluded with respect to this issue that the test results were "merely cumulative" and "unlikely" to have changed the jury's verdict.  (Id.).

Justice Marcus also gave short shrift to the argument that the test results would have bolstered McIntosh's contention that Cindy was seeking to shield another man from learning of her consensual sexual encounter with McIntosh.  As he explained, that argument could have been made equally effectively based on Cindy's admission that she was sexually active, thereby rendering the test results "cumulative."  (Id. at 141).  Indeed, although the presence of another male's DNA on the outside of the condom was consistent with Cindy having "engaged in sex with someone else before having sex with [McIntosh]," it also could have been transferred there when the condom was discarded "on the floor of the SUV."  (Id.).

Finally, in the course of rejecting the claim that the OCME Report "probably" would have resulted in a different verdict, Justice Marcus noted the strength of the People's case, opining that Cindy was a "credible trial witness" and that McIntosh was "not credible at all."  (Id. at 142).  He also pointed out that it was unlikely that the jury would have concluded that Cindy consented to the sexual encounters with McIntosh given "the testimony provided by the police officers who encountered [McIntosh] running from the SUV and firing upon one of the officers, and found [Cindy] unconscious in the vehicle, clad only in her underpants, her faced bruised and hemorrhaging, with a cord or string around her neck, having been choked with such force that nearly a year after the event marks on her neck were still visible."  (Id.).

Turning to the Brady claim, Justice Marcus noted that a "defendant must establish, not only that the evidence was suppressed by the State, either willfully or

19

inadvertently, but also that, as a result, prejudice ensued." (Id. at 144) (quotation marks, brackets, and ellipses omitted). Moreover, as he further observed, the New York courts have held that "[e]vidence is not suppressed where the defendant knew of, or should reasonably have known of, the evidence and its exculpatory nature." (Id.) (quotation marks omitted).

The Justice held, as a matter of law, that the People cannot be deemed to actually or constructively possess test results that were known to OCME, but not the prosecutor. (Id. at 143-44).[9]

The Justice also concluded that McIntosh's Brady claim failed for at least two further reasons. First, the alleged Brady material was not suppressed because Mr. Turner was aware that the rape kit had been submitted for analysis and could have sought to have OCME complete its analysis and prepare a report prior to trial. (Id. at 145). Second, for the same reasons that the Justice rejected the newly-discovered evidence claim, he found that McIntosh had failed to establish that the outcome of the trial would have been different had the OCME Report results been known to the defense. (Id. at 146-47).

Justice Marcus next addressed the numerous ways in which McIntosh claimed his trial counsel was ineffective. (Id. at 147-60). The court found that none of

---

[9] The Justice further suggested that OCME may not have even completed its testing by the end of McIntosh's trial. (Id. at 144). It appears that this is a factual error, because Rosenberg testified that the examination of the evidence was completed in 2001 and McIntosh's trial did not commence until May 14, 2002. (See id. at 46).

these assignments of error, "either individually or in totality," was meritorious.  (Id. at

150).  Citing Mr. Turner's affirmation, Justice Marcus concluded that many of the

attorney's alleged failings were part of a trial strategy, pursued with McIntosh's consent,

to convince the jury that Cindy had willingly participated in their sexual encounters and

travels around Connecticut and New York.[10]

   Justice Marcus further determined that Mr. Turner's decisions were

reasonable given the strategy he chose to pursue, and that McIntosh failed to show that

any of the avenues he advocated would have been more effective.  (Id. at 152).  The

Justice noted that Mr. Turner had cross-examined and impeached the People's witnesses,

made the jury aware of Cindy's past bad acts and crimes (including the fact that she sold

marijuana and had used it while with McIntosh), and called attention to the fact that

Cindy was sexually active and to the lack of forensic evidence.  In Justice Marcus' view,

this approach enabled Mr. Turner to argue that Cindy was not credible – either because of

her deliberate deceit or because her memory was impaired.  (Id. at 153).  As the Justice

explained, questioning Cindy with respect to certain less significant inconsistencies, as

McIntosh urged, would have risked "invok[ing] jury sympathy in her favor."  (Id.).

   Justice Marcus also rejected McIntosh's argument that trial counsel was

incompetent for failing to consult with an expert on the manifestations of sexual abuse.

---

[10]  Justice Marcus also rejected McIntosh's claim that he had not agreed to this strategy, noting that McIntosh's affidavit showed that he continued to pursue that defense in his motion, and that, in any event, McIntosh's assent was irrelevant because defense counsel ultimately is responsible for managing a case and making strategic or tactical decisions.  (Id. at 150-52 (citing, among other cases, Faretta v. California, 422 U.S. 806, 820-21 (1975))).

As he noted, because there was no indication that Cindy had physically resisted McIntosh's sexual advances, the proposed testimony would not have bolstered counsel's arguments regarding the absence of any evidence of injury to Cindy resulting from sexual intercourse.  (See id. at 154).  The Justice further observed that trial counsel had unsuccessfully sought an expert concerning the use of a ligature to enhance female arousal, noting that this, among other efforts, was "far from ineffective assistance."  (Id. at 153-54).

Equally implausible in Justice Marcus' view was the assertion that defense counsel prejudiced McIntosh by encouraging the jurors to review hospital records that he erroneously described as showing that "no sperm" was found in her vagina.  (Id.; Tr. 663).  Assuming that counsel had, in fact, erred by mischaracterizing the contents of the medical records, Justice Marcus found that this was "an isolated act" that did not amount to ineffectiveness "viewed in the context of the entire trial."  (A. 155).  As the Justice further observed, the jurors' viewing of the medical records during their deliberations could scarcely have prejudiced McIntosh since the records merely reiterated contentions that were well known to them:  that Cindy claimed to have been raped and strangled. (A.154; see also Tr. 663, 808).  Moreover, the police records that McIntosh contended should have been introduced also contained statements he "did not want re-emphasized" – that Cindy "possibly" had been raped and had "been found with a cord around her neck." (Id. at 155).

Finally, Justice Marcus rejected McIntosh's challenge arising out of defense counsel's failure to make certain arguments to the court and the jury regarding the crime of attempted murder in the first degree.  (Id. at 155-56).   Both assignments of error were predicated on the notion that the "rapes, kidnapping and attempted murder[] were all part of one criminal incident," (id. at 157), thereby making it impossible for McIntosh to have attempted to kill Cindy with the intent to eliminate her as a witness to a crime committed on a "prior occasion."  Justice Marcus noted that counsel's decision not to raise the issue in summation was consistent with his strategy of arguing that no crime had taken place because Cindy consented to everything that occurred.  As the Justice observed, raising this "technical argument" for the jury could have confused issues that counsel "carefully tried to narrow," and might have suggested that the defense was conceding guilt as to some charges, "albeit not in the first degree."  (Id. at 157).

Insofar as McIntosh criticized the failure to move to dismiss on that ground, Justice Marcus found that the trial evidence was legally sufficient to support the charge of attempted murder in the first degree since "[a]ll of the rapes and the sodomy had been committed over twelve hours before" McIntosh attempted to kill Cindy.  (Id. at 159).  The Justice further observed that whether the crimes were committed on a prior occasion or were part of the same criminal incident was a question for the jury.  (Id.).  Moreover, the Justice concluded that even if the "one crime" argument should have been advanced prior to sentencing, it would be inappropriate to find counsel ineffective based on an issue of law that related to only one of the four counts on which McIntosh was convicted, and

23

which, if successful, would only have reduced the attempted murder in the first degree

conviction to attempted murder in the second degree.  (Id.).

### 3.   Motion for Forensic DNA Testing

On June 16, 2005, the LAS filed a motion pursuant to CPL § 440.30(1-a),

through which McIntosh sought forensic DNA testing of Cindy's clothing and other

physical evidence seized from the SUV.  (Ex. 3 at 2; A. 128; Pet'r's Mem. at 52).  By

order dated September 8, 2005, Justice Marcus denied that motion.  (Id.).

### 4.   Direct Appeal

After his sentencing, McIntosh timely filed a direct appeal, which was

consolidated with his appeal from the denial of his CPL §§ 440.10 and 440.30 motions.

(Ex. 3 at 2).  In his direct appeal, McIntosh claimed that:  (a) New York lacked

jurisdiction to prosecute him for the crime of kidnapping and the prosecution failed to

prove his guilt on that charge beyond a reasonable doubt; (b) the prosecution failed to

prove beyond a reasonable doubt that McIntosh committed attempted witness-elimination

murder and counsel was ineffective for failing to preserve his insufficiency arguments; (c)

the court erred by instructing the jury that the prosecution was not required to prove

motive, but that the witness-elimination attempted murder charge required proof of a

"conscious objective to eliminate Cindy . . .  as a witness," and counsel was ineffective

for failing to object; (d) trial counsel was ineffective for failing to conduct a pretrial

investigation, use available discovery materials to substantiate defense claims, and make

pertinent legal arguments; (e) the prosecution violated its duty under Brady to disclose the

OCME Report; and (f) the motion court erred by denying the CPL § 440.30 motion for forensic testing of Cindy's clothing and other evidence recovered from the SUV.  (Id. at 2-3).

On June 12, 2008, the Appellate Division, First Department, unanimously affirmed McIntosh's conviction and the denial of his post-trial motions.  See People v. McIntosh, 860 N.Y.S.2d 64 (1st Dep't 2008).  In its decision, the court first held that New York had jurisdiction to prosecute McIntosh on the kidnapping charge even though the alleged sexual assaults occurred in Connecticut, because "an element of the offense occurred in New York, where [McIntosh] continued to restrain" Cindy.  Id. at 66.  The court further noted that the "statute conferring jurisdiction" did not require that "more than one element of a crime occur in New York, or that any elements occur simultaneously."  Id.  The court also found that the evidence supported the inference that McIntosh restrained Cindy in New York with an intent to sexually abuse her.  Id.

Turning to McIntosh's claims regarding the sufficiency of the evidence concerning attempted witness-elimination murder, the court first held that these claims were unpreserved and declined to review them in the interest of justice.  Id.  Ruling in the alternative, the court found that there was "sufficient evidence based on the jury charge as given," to which no exception had been taken.[11]  As the court observed, the alleged

---

[11]     In that charge, Justice Marcus relied on the definition of a "criminal transaction" found in CPL § 40.10(2)(a), instructing the jury that "a person who is murdered is not a witness to a crime committed on an occasion prior to the murder if the crime to which the person was a witness and the murder of that person are so closely related and connected in point of time or

(continued...)

"sexual attacks and the attempted murder were separated by a prolonged break in time, a change of localities, and the formation of distinct criminal intentions."   Id. at 67. Accordingly, a "rational jury could have found that the sexual assaults in Connecticut and the attempted murder in New York were not 'so closely related and connected in point of time or circumstance [of] commission as to be part of the same criminal incident.'"   Id.

The court further determined "that the trial record, as supplemented by the extensive record on the motion to vacate the judgment of conviction, establishe[d] that [McIntosh] received effective assistance of counsel."   Id. at 68.   Specifically, the court found that the actions challenged by McIntosh constituted "reasonable strategic decisions," and that, even if counsel should have taken the steps suggested by McIntosh, his "failure to do so did not prejudice [McIntosh] or deprive him of a fair trial."   Id.

The court also gave short shrift to McIntosh's Brady claims, explaining that Justice Marcus had properly concluded that the results of the forensic tests were "not subject to disclosure," and that there was, in any event, "not even a reasonable possibility, under the totality of the circumstances of the case, that the nondisclosure could have affected the verdict."   Id.   The court similarly found that the Justice had properly denied McIntosh's CPL § 440.30(1-a) motion "since there was no reasonable probability that DNA testing could have led to a more favorable verdict."   Id.   Finally, the court rejected

---

<sup>11</sup>(...continued)
circumstance [of] commission as to be part of the same criminal incident."   (Tr. 755, 797); see McIntosh, 860 N.Y.S.2d at 67.

McIntosh's "remaining contentions, including his pro se claims" as unpreserved, but went on to state, as an alternative holding, that they also were meritless.  Id.

McIntosh sought leave to appeal, which Judge Ciparick of the Court of Appeals denied on October 30, 2008.  See People v. McIntosh, 11 N.Y.3d 833 (2008).

D.      Petition

McIntosh timely filed his Petition on January 8, 2010.[12]  (ECF No. 2).  In that Petition, McIntosh asserts two grounds for habeas relief.  He first contends that the prosecution violated its duty under Brady and its progeny by failing to disclose the OCME Report.  Second, McIntosh asserts that he was denied the effective assistance of counsel because his trial attorney failed to:  (1) investigate the forensic evidence; (2) retain a medical expert; (3) use available documents to support defense arguments and effectively impeach Cindy; and (4) make pertinent legal arguments and objections.  (Id. ¶ 12).

II.     Discussion

A.      Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Rather, a state

---

[12]      AEDPA provides a one-year statute of limitations for the filing of a habeas petition under Section 2254.  See 28 U.S.C. § 2244(d)(1).  That period began to run in January 2009, ninety days after the New York Court of Appeals ruled.  See S. Ct. R. 13(1) (affording a petitioner ninety days to seek certiorari); Williams v. Artuz, 237 F.3d 147, 150 (2d Cir. 2001) ("petitioner's conviction becomes final for AEDPA purposes when his time to seek direct review in the United States Supreme Court by writ of certiorari expires") (internal quotation marks and brackets omitted).

prisoner seeking habeas relief under Section 2254 must show that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner bears the burden of proving, by a preponderance of the evidence, that his rights have been violated.  Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by AEDPA, provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in Jones v. Stinson, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'"  229 F.3d 112, 119 (2d Cir. 2000).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly

established federal law was objectively unreasonable." Id. at 409.  This standard does not require that reasonable jurists would all agree that the state court was wrong.  Id. at 409-10.  Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." Williams, 529 U.S. at 389.

B.      Brady Violation

McIntosh's first claim is that the prosecution violated its duty to obtain and disclose the OCME Report.  (See Pet. ¶ 12 (Ground One); Pet'r's Mem. at 55-72).  Under Brady and its progeny, a prosecutor must disclose evidence favorable to the accused that is material to either guilt or punishment.  Brady, 373 U.S. at 87; United States v. Agurs,

427 U.S. 97, 107 (1976).  However, not every <u>Brady</u> violation requires that a conviction

be set aside.  Rather, to secure that relief, an accused must show that (1) the evidence was

favorable to him, because it was either exculpatory or impeaching; (2) the evidence was

suppressed by the prosecution, either willfully or inadvertently; and (3) the omission

caused prejudice.  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).  Here, McIntosh

cannot make the requisite showing.

      1.    <u>Was the OCME Report Favorable to the Accused?</u>

Material favorable to an accused includes both exculpatory material and

that which might be used to impeach a prosecution witness.  <u>United States v. Wong</u>, 78

F.3d 73, 79 (2d Cir. 1996).  McIntosh contends in that regard that the OCME Report was

exculpatory because it supported a version of McIntosh's encounter with Cindy that was

at odds with her testimony that he repeatedly subjected her to unprotected forcible sex.

(Pet'r's Mem. at 67-68).  McIntosh relies, in particular, on Rosenberg's hearing testimony

that the absence of semen on the vaginal swabs was not inconsistent with McIntosh's

assertion that he and Cindy engaged in a single act of protected sex during which he

ejaculated and a second act of unprotected sex during which he did not ejaculate.  (<u>Id.</u> at

68-69).

McIntosh maintains further that the OCME Report would have provided the

defense with material that could be used to impeach Cindy.  (<u>Id.</u> at 68-70; Reply Mem. at

8-10).   In his view, the fact that no semen was found on the vaginal swabs undermined

Cindy's claim that McIntosh had subjected her to repeated instances of forced sex.

(Pet'r's Mem. at 68).  McIntosh also argues that the finding that there was genetic

material from a second male source on the outside of the condom could have been used

by his counsel to impeach Cindy's testimony that she did not currently have a boyfriend,

(id. at 69 (citing A. 77, 80, 110-11)), or to suggest that she had lied about the consensual

nature of her sexual encounter with McIntosh to protect her relationship with another

man, (id. (citing Olden v. Kentucky, 488 U.S. 227 (1988))).

   At the hearing regarding the CPL § 440.10 motion, McIntosh's counsel

sought to establish – and criminalist Rosenberg agreed – that the DNA evidence in this

case was entirely consistent with there having been only one act of protected intercourse

and no acts of unprotected intercourse between Cindy and McIntosh.  (A. 92-93).  As

Rosenberg also testified, however, the DNA evidence was equally consistent with

Cindy's testimony that there was one act of protected intercourse and two further acts of

unprotected intercourse.  (Id. at 57 ("I can't conclude that there was no unprotected sex,

because there is DNA from [McIntosh] on the outside of the condom. . . . There was

semen found on the anal swab, [which] could have been due to an unprotected sexual

act."), 83 ("Considering that . . . there was semen found on the anal swab, . . . there could

have been another sexual encounter."), 101 (agreeing that the DNA findings were "not

inconsistent" with Cindy's testimony that she and McIntosh had "an act of protected

intercourse . . . and two acts of unprotected intercourse over a period of time"); see also

id. at 107 (describing the lack of DNA on oral swabs as "in no way inconsistent" with

Cindy's testimony that she was "orally sodomized")).  Indeed, in his papers opposing

McIntosh's motion to vacate, the prosecutor indicated that had he known of the DNA results, he would have introduced them during the People's case-in-chief to establish that McIntosh had a sexual motive for the kidnapping.  (McCarthy Affirm. ¶ 10).

       The suggestion that the presence of a second male's genetic material on the outside of the condom would have been helpful to the defense is, if anything, even more speculative.  At the outset, as Rosenberg explained at the hearing, the source of that material could have been something other than semen, such as the condom coming into contact with "epithelial . . .  cells on the floor of the car" after the condom was discarded there as Cindy described.  (A. 82, 110).  Accordingly, the fact that such material was detected scarcely would have proven that Cindy had recently had intercourse with another man, much less that she currently was in a relationship that she was seeking to protect by falsely accusing McIntosh of kidnapping and rape.

       In any event, even if the OCME Report had contained findings that were exculpatory or useful as impeachment material, to prevail on his Brady claim McIntosh also would have to show that they were "suppressed" and that this resulted in prejudice to him.  Strickler, 527 U.S. at 281-82.

       2.     Was the Evidence Suppressed?

       Justice Marcus decided that the prosecutor did not have "constructive possession" of the OCME Report.  (A. 144 (citing, inter alia, People v. Washington, 86

N.Y.2d 189, 192 (1995) (rejecting <u>Rosario</u> claim[13] because "the duties of OCME are, by

law, independent of and not subject to the control of the office of the prosecutor and . . .

OCME is not a law enforcement agency"))).  The Appellate Division similarly held that

Justice Marcus had "properly concluded" that the OCME test results were "not subject to

disclosure under <u>Brady</u>."  <u>McIntosh</u>, 860 N.Y.S.2d at 68.  Inasmuch as the New York

Court of Appeals has held that OCME is an independent agency not within a prosecutor's

control, <u>Washington</u>, 86 N.Y.2d at 192, the Appellate Division's determination that the

prosecutor in this case could not be accused of having improperly withheld the OCME

Report arguably was correct.[14]  There is no need to resolve this issue, however, because

Justice Marcus also found that defense counsel was aware that the rape kit existed and

had been submitted for testing and, therefore, could himself have requested that a report

be prepared prior to trial.  (A. 145).  In these circumstances, as a matter of law, the

OCME Report cannot be considered improperly withheld.  <u>See</u> <u>United States v. Paulino</u>,

445 F.3d 211, 225 (2d Cir. 2006) ("As this court has frequently recognized, evidence is

not considered to have been suppressed within the meaning of the <u>Brady</u> doctrine if the

---

[13]     In <u>People v. Rosario</u>, 9 N.Y.2d 286, 289 (1961), the New York Court of Appeals, in effect, incorporated the holding of <u>Jencks v. United States</u>, 353 U.S. 657, 672 (1957), into New York law.  An assistant district attorney thus must disclose any statements or reports of witnesses that are in the People's possession if they touch upon the subject matter of their testimony at trial.  <u>Rosario</u>, 9 N.Y.2d at 289.

[14]     In <u>Young v. Greiner</u>, 296 F. Supp. 2d 334, 342 (E.D.N.Y. 2003), Judge Weinstein expressed doubt that knowledge of exculpatory information by the "state medical examiner should not be imputed to the prosecution."   The judge found it unnecessary to resolve that "interesting question" because there were other reasons that the petitioner could not prevail on his <u>Brady</u> claim.  <u>Id.</u> at 342-43.

defendant or his attorney either knew, or should have known, of the essential facts

permitting him to take advantage of that evidence.") (internal brackets and quotation

marks omitted).

        3.      <u>Would the Verdict Have Been Different?</u>

Turning to the third element of a <u>Brady</u> claim, Justice Marcus found that

McIntosh had "failed to establish . . . a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different."  (A.

146-47) (internal quotation marks omitted).  The Appellate Division went further,

concluding that there was "not even a reasonable <u>possibility</u>, under the totality of the

circumstances of the case, that the nondisclosure could have affected the verdict."

<u>McIntosh</u>, 860 N.Y.S.2d at 68 (emphasis added).  To prevail as to this question here,

McIntosh must show that these findings constituted an "unreasonable determination of

the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.

§ 2254(d)(2).

McIntosh cannot make the requisite showing since there was abundant

evidence that the inconclusive DNA test results, even if made known to the jury, would

not have led to a different verdict on the kidnapping or attempted witness-elimination

murder counts.  Indeed, McIntosh's tale of two instances of consensual sex, the second of

which featured strangulation meant to heighten Cindy's sexual pleasure, verged on the

ludicrous since she was found in his car only a little while later, strangled, unconscious,

and wearing only her underpants.  This story also is belied by the extent of Cindy's

injuries:  the swelling and bruising to her forehead, the petechial hemorrhages left on her face, and the wound to her neck that remained visible over a year later.  Moreover, rather than rushing Cindy to a hospital, McIntosh had brought her to a remote area near a creek, suggesting that her welfare was not foremost in his mind.  Finally, any possible suggestion that McIntosh's prior conduct was as innocent as he now suggests was powerfully contradicted by his decision to fire his gun at Sgt. Grosskopf repeatedly as he fled.

Based on this "devastating" evidence, Justice Marcus concluded that it was "highly unlikely that the jury's verdict would have been altered by test results from which no definite conclusions could be drawn."  (A. 142).  The Justice further noted that Cindy was a "credible trial witness" and that McIntosh was "not credible at all."  (Id.).  There clearly was an adequate evidentiary basis for Justice Marcus to have made these findings.  Furthermore, they must be presumed correct unless McIntosh is able to rebut them by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Here, to be sure, there is some evidence pointing to McIntosh's possible innocence, including his own testimony, that of his uncle and brother, and perhaps even some of the DNA test results.  None of that evidence suffices, however, to overcome the presumption that both Justice Marcus and the Appellate Division correctly found that the OCME Report results would not have convinced the jury to reach a different verdict.

Accordingly, McIntosh's Brady claim does not entitle him to habeas relief.

C.     Ineffective Assistance of Trial Counsel

The only other claim that McIntosh advances is that his trial counsel was so ineffective as to deprive him of a fair trial.  (See Pet. ¶ 12 (Ground Two); Pet'r's Mem. at 73-110; Reply Mem. at 12-20).  According to McIntosh, Mr. Turner's representation sank to that level because he unjustifiably failed to:  (1) investigate the forensic evidence and obtain the OCME Report; (2) retain a medical expert; (3) familiarize himself with and utilize discovery documents to substantiate defense arguments and cross-examine Cindy; (4) move to dismiss the charges of attempted murder in the first degree and kidnapping in the first degree on the theory that key elements were not established and, if unsuccessful, make the same argument to the jury in summation; (5) request a limiting instruction regarding the jury's consideration of sex crimes allegedly committed in Connecticut; and (6) object to a jury instruction stating that motive was not an element of any of the crimes charged.

To prevail on any of these claims on habeas review, McIntosh must demonstrate that (1) his counsel's performance "fell below an objective standard of reasonableness" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).  Under Strickland, there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  Therefore, a petitioner "must overcome the

presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

As the Second Circuit has noted, "[t]he Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).  Indeed, because McIntosh raises this claim in a habeas proceeding, he "must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance." Bell v. Cone, 535 U.S. 685, 698-99 (2002) (citing Williams, 529 U.S. at 411). To prevail, McIntosh must show that the state courts "applied Strickland to the facts of his case in an objectively unreasonable manner." Id. at 699.

The application of these two "highly deferential" standards means that "the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v. Richter, 131 S. Ct. 770, 788 (2011).

1.     Failure to Investigate Forensic Evidence

McIntosh argues that his trial counsel was ineffective at the preliminary investigative stage because he did not investigate the forensic evidence adequately and, consequently, did not obtain the OCME Report.  McIntosh contends that this failure was unreasonable because the case turned on his credibility and that of Cindy, who had issues that should have prompted an attorney to seek forensic evidence that could undercut her allegations.[15]   (Pet'r's Mem. at 73-93).

It is well-established that the effective assistance of counsel to which a criminal defendant is entitled does not begin at trial.  See Strickland, 466 U.S. at 691.  Consequently, a defendant is entitled to be represented by an attorney who has made either "reasonable investigations" or "a reasonable decision that makes particular investigations unnecessary."  Greiner v. Wells, 417 F.3d 305, 320-21 (2d Cir. 2005) (citing Strickland, 466 U.S. at 691).  The duty to investigate, however, "does not . . . compel defense counsel to investigate comprehensively every lead or possible defense."  Id. at 321 (citing Strickland, 466 U.S. at 699, and United States v. Cruz, 785 F.2d 399, 406 (2d Cir. 1986)).  Accordingly, "when there is 'reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.'"  Id. (quoting Strickland, 466 U.S. at 691).  Moreover, "'[s]trategic choices made after thorough

---

[15]     One of the credibility issues that McIntosh contends should have been pursued arises out of documents allegedly indicating that the police may have suggested to Cindy that she claim to have been raped.  (Id. at 90-91).

38

investigation of law and facts relevant to plausible options are virtually unchallengeable,' and even strategic choices made after less than complete investigation do not amount to ineffective assistance – so long as the known facts made it reasonable to believe that further investigation was unnecessary." Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 690).

As previously noted, McIntosh's theory of defense was that no crime had occurred prior to Sgt. Grosskopf's arrival on the scene because Cindy was a willing participant. Inasmuch as his counsel planned to concede that sexual contact had occurred, physical evidence substantiating that fact was not material to his defense. Indeed, McIntosh testified at trial that he and Cindy had protected sex in the nightclub parking lot and later engaged in a further act of unprotected intercourse. There thus was no credibility contest between Cindy and McIntosh with respect to whether they had sexual contact, but only as to whether that contact occurred with Cindy's consent. Regardless of what the test results might have shown, they would not have shed any light on the critical issue of consent. It thus was a perfectly reasonable strategic decision for counsel to decline to seek out the report.

Further, as Rosenberg's testimony made clear, the findings actually contained in the OCME Report would not have illuminated the question of consent. McIntosh therefore cannot show that he was prejudiced by Mr. Turner's failure to obtain the results of OCME's testing at the investigative stage.

39

Moreover, Mr. Turner used the lack of the OCME Report to McIntosh's advantage.  For example, he established that, although the police had recovered various items from the vehicle, Det. Rivera did not know the results of forensic testing on these items.  (Tr. 382, 389, 392-94).  In his summation, he then was able to argue that the prosecution's failure to put forth any forensic evidence regarding those items was a significant gap in the People's case.  (Id. at 645-46).  He also argued that the evidence that was part of the record – including the photographs of Cindy and Dr. Ely's testimony – was consistent with McIntosh's account.  (Id. at 667-69).  These arguments would not have been helped, and in fact might have been hindered, had he received the OCME Report prior to trial.

### 2.   Failure to Retain Expert

McIntosh further claims that his counsel was deficient for failing to consult with and retain an expert regarding the use of crimescopes and the "physical manifestations of sexual contact."  (Pet'r's Mem. at 106; see id. at 79-83).  Despite this criticism, counsel did attempt – albeit, unsuccessfully – to "find an expert to testify about the use of a ligature during sex to enhance the experience."  (Dille Affirm. ¶ 149). Effective assistance does not require counsel to scour the earth for an expert who may not exist.  Further, counsel demonstrated his tenacity by seeking to introduce that theory into the case through his cross-examination of Dr. Ely notwithstanding his inability to find his own experts with respect to this point.  (See Tr. 518-19).

Even if counsel should have sought out further experts, McIntosh has failed to show a probability that their testimony would have changed the outcome of his trial. For example, McIntosh faults counsel for failing to call an expert to testify about the significance of finding no traces of semen during the crimescope investigation of the SUV. (Pet'r's Mem. at 106). There was absolutely no evidence, however, that McIntosh ejaculated during any episode of unprotected intercourse or oral sex with Cindy. Accordingly, as Rosenberg explained during her hearing testimony, the negative crimescope findings were not inconsistent with either Cindy's version or McIntosh's version of the relevant events. A crimescope expert therefore would not have materially aided his case.

Similarly, although Cindy testified that McIntosh choked her on several occasions when she cried, she never indicated that she had physically resisted his demands for sex.[16] She also admitted in response to defense counsel's questions that while it "hurt a little bit," she had not sustained any injuries as a result of their sexual encounters. (Id. at 328). In these circumstances, McIntosh's hypothesis that the testimony of an expert regarding the physical manifestations of sexual contact would have been helpful to him amounts to sheer speculation. See, e.g., Maddox v. Lord, 818 F.2d 1058, 1062 (2d Cir. 1987) (claim that defense counsel did not investigate prosecution's forensic evidence fails to meet Strickland test absent any indication that the result would

---

[16]   Cindy did testify that she tried to stop McIntosh when he was choking her. (Tr. 299-300).

have been exculpatory); <u>Muhammad v. Bennett</u>, No. 96 Civ. 8430 (JSR) (HBP), 1998

WL 214884, at *1 (S.D.N.Y. Apr. 29, 1998) (petitioner's "speculative claim about the

testimony of an uncalled witness is accorded little weight in federal habeas review").

Indeed, even at this late stage, McIntosh has yet to proffer any evidence that there is, in

fact, an expert who could have testified favorably for him with respect to this issue.

### 3.   Failure to Utilize Discovery Documents

McIntosh also alleges that his attorney was ineffective because he failed to

make use of available discovery documents to "substantiate defense arguments and to

effectively impeach [Cindy]."  (Pet'r's Mem. at 93).  His related suggestion that his

counsel failed to review those materials adequately is, however, plainly belied by the

record.  (<u>See, e.g.</u>, Dille Affirm. ¶¶ 147 ("Counsel stated that he read all the <u>Rosario</u>

material he received in this case."); Turner Affirm. at 2 ("I was aware of all the discovery

materials and all of [Cindy's] prior inconsistent statements," but chose not to "come

across to the jury as nit-picking"); Tr. 300-02 (counsel objecting to the receipt of

unredacted hospital records), 358-59 (counsel indicating that he wanted to see a knapsack

in which drugs were found and that portions of the medical records required redaction)).

With 20-20 hindsight, McIntosh is able to point to instances in which the

materials disclosed by the prosecution prior to trial could have been exploited more

effectively.  For example, he notes that Cindy made a statement to the police in which she

reported having been forced into the SUV at gunpoint, rather than entering voluntarily.

(Pet'r's Mem. at 94-95).  That alleged statement is not before this Court.  (<u>See</u> Resp't's

Mem. at 31). In any event, even if it were, cross-examination as to this point would have reemphasized for the jury that McIntosh had a firearm with him when he first met Cindy. Moreover, it might have opened the door to redirect questions about the circumstances in which she gave that statement in order to highlight Cindy's extremely fragile physical and mental state at the time that she first was questioned by the police. This is precisely the sort of judgment call that a criminal defense lawyer is entitled to make without being second-guessed.

Similarly, McIntosh now faults his trial lawyer for not seeking to introduce Det. Rivera's report, which documented the negative crimescope findings and the presence of a bottle of Hennessy in the car. (Pet'r's' Mem. at 95-96). As Justice Marcus noted, however, the police reports

> contained a reference to the complainant having possibly been raped and a description of her having been found with a cord around her neck – information that in other contexts [McIntosh] now claims he did not want re-emphasized to the jury. Consequently, it is difficult to perceive the prejudice [he] claims to have suffered from his trial attorney's failure to offer the police reports in evidence.

(A. 154-55).

Moreover, the trial transcript confirms that Mr. Turner effectively attacked Cindy's credibility throughout the trial. In his opening statement, he told the jurors that they would "have doubts as to whether things happened the way she said it happened or whether she is basically lying because she doesn't want to be charged herself" as a drug seller or fugitive. (Tr. 34-35). Thereafter, in his cross-examination, he elicited testimony

43

that Cindy had left home at a young age, was arrested several times for selling crack, and had run away from a group home in violation of her conditions of parole.  (Id. at 308-12). Mr. Turner also showed that Cindy had been smoking marijuana both before and during her time with McIntosh.  (Id. at 327, 336).  As noted earlier, he further established that Cindy did not have any physical injuries as a direct result of her sexual relations with McIntosh.  (Id. at 328).  Finally, he was able to point out inconsistencies between Cindy's trial and grand jury testimony.  (See, e.g., id. at 321-24).  Building on his cross-examination, during his summation, Mr. Turner painted Cindy as a "deceitful young lady" and recounted her history of drug use and prior run-ins with the law.  (Id. at 659). He further directed the jury's attention to her motive to lie and to inconsistencies in her testimony, suggesting that she was too high to recall events accurately.  (Id. at 659, 661). While he also apparently stated to the LAS that it was "his practice to use all available impeachment material" during a trial, (see Dille Affirm. ¶ 150), the mere fact that he did not cross-examine Cindy about every prior inconsistent statement does not mean that he failed to render effective assistance.  Indeed, a scorched earth approach could have led the jury to be even more sympathetic toward her.

Finally, McIntosh cites as an example of Mr. Turner's allegedly inadequate preparation his summation argument that the hospital records revealed no sperm or injury. (Pet'r's Mem. at 74, 97; Tr. 663).  That information evidently was contained instead in police reports that counsel failed to introduce into evidence.  (Pet'r's Mem. at 74, 97). Although the hospital records detailed Cindy's claim of rape and strangulation as well as

the rape testing and treatment that she received, Justice Marcus found counsel's error to be <u>de</u> <u>minimis</u> because they did not contain any information unknown to the jurors. (A. 154). This assessment was not unreasonable. Moreover, as noted earlier, McIntosh's assertion that trial counsel was unfamiliar with those records is belied by the fact that Mr. Turner repeatedly objected to their admission and proposed redactions if they were to be received. (<u>E.g.</u>, Tr. 300-02, 359-60).

### 4.    Failing to Exploit the Insufficiency of the Evidence

McIntosh further contends that the prosecutor's theory that New York had jurisdiction over the kidnapping charge because the crime began in Connecticut but continued in New York was inconsistent with the "prior crime" element of the attempted witness-elimination murder charge. McIntosh maintains that his counsel therefore unreasonably failed to move to dismiss those charges based on this inconsistency and, if unsuccessful, to pursue the argument with the jury in summation. (Pet'r's Mem. at 98-102).

Turning first to the summation, Mr. Turner's defense theory was that Cindy had willingly accompanied McIntosh and engaged in consensual sex and that, therefore, no crime had occurred with respect to her. (Turner Affirm. at 2). Had counsel also argued that certain jurisdictional elements had not been established, he would have detracted from his argument that McIntosh was not guilty of <u>any</u> crime arising out of his interaction with Cindy. As Justice Marcus noted in his post-trial decision:

> The technical argument [McIntosh] now insists trial counsel
> should have made to the jury – that the rapes, kidnapping and
> attempted murder[] were all part of one criminal incident –
> may have only served to confuse the issues he had so
> carefully tried to narrow for the jury, and might inadvertently
> have left the jurors with the unintended suggestion that he was
> conceding the possibility that [McIntosh] had committed rape,
> kidnapping and attempted murder, albeit not in the first
> degree.  Asking the Court to find that this choice constitutes
> ineffective assistance of counsel is inviting the Court to
> engage in exactly the type of second-guessing that is
> specifically to be avoided in determining whether a defendant
> received ineffective assistance of counsel at trial.

(A. 157-58).  The Appellate Division impliedly endorsed this view.  See McIntosh, 860

N.Y.S.2d at 68 ("The actions of counsel challenged by defendant on appeal constituted

reasonable strategic decisions.").

To prevail in this forum, McIntosh must show that the state courts applied

Strickland to his summation claim in an objectively unreasonable manner.  Because

Strickland mandates a presumption that counsel made a reasonable tactical decision,

McIntosh cannot possibly make the requisite showing.  The state courts' findings that, in

effect, McIntosh's counsel's omissions in summation constituted "sound trial strategy"

were utterly reasonable.  See Strickland, 466 U.S. at 689 (quoting Michel, 350 U.S. at

101).

The trial court, of course, would have had an opportunity to dismiss the

charges of murder in the first degree and kidnapping in the first degree had Mr. Turner

made his motion during the trial, rather than at the sentencing.  When Justice Marcus

eventually considered those arguments, however, he rejected them swiftly, concluding

that the evidence was sufficient to sustain both charges.  (A. 158-59).  The Appellate

Division also opined that there was enough evidence to establish both crimes because (a)

McIntosh "continued to restrain" Cindy in New York "with an intent to sexually abuse

her," and (b) "a rational jury could have found that the sexual assaults in Connecticut and

the attempted murder in New York were not so closely related and connected . . . as to be

part of the same criminal incident."  McIntosh, 860 N.Y.S.2d at 66-67 (internal quotation

marks omitted).  In light of these trial and appellate court findings, McIntosh plainly

would not have secured the dismissal of the first degree attempted murder and kidnapping

charges even if he had timely brought his motion.  It follows that he has suffered no

prejudice and cannot prevail on this aspect of his ineffectiveness claims.

### 5.      Failure to Request Limiting Instructions

McIntosh further complains that defense counsel's representation was

deficient because he failed to request a limiting instruction regarding the jury's

consideration of evidence of uncharged sexual acts.  (Pet'r's Mem. at 74).[17]

Prior to trial, Mr. Turner did object to the receipt of the prior act evidence

concerning uncharged sexual acts that the People sought to introduce.  (See Dille Affirm.

¶¶ 10, 12).  Thereafter, however, he failed to request a limiting instruction either when the

evidence of the rapes in Connecticut was received or during the pre-charge conference.

(See Tr. 274-78, 280-81, 480-84, 632-35).  In his Petition, McIntosh contends that an

appropriate limiting instruction would have restricted the jury's consideration of the

---

[17]      McIntosh does not challenge the propriety of admitting the evidence.  (Id.).

sexual assaults to the intent-to-sexually-abuse element of the crime of kidnapping in the

first degree because the prosecutor had not argued that this evidence also was applicable

to the "crime committed on a prior occasion" element of murder in the first degree when

the issue was raised prior to trial.  (See Ex. 3 at 10, 133).  Had defense counsel requested

such a narrow limiting instruction, however, the prosecutor undoubtedly would have

objected on the ground that the sexual assaults also were relevant to the latter crime.

Indeed, as the Appellate Division later noted, the "People presented the attempted first

degree murder charge under the theory that [McIntosh] tried to kill [Cindy] in New York

in order to prevent her from testifying as a witness to the sexual assaults committed in

Connecticut the previous day."  McIntosh, 860 N.Y.S.2d at 67.

   McIntosh has failed to explain why the prosecutor was not entitled to press

this theory.  He also has not shown that the prosecutor made any improper argument

before the jury relating to the uncharged sexual assaults.  Moreover, although Justice

Marcus did not give any limiting instruction when Cindy testified about McIntosh's

sexual assaults, he did instruct the jurors at the close of the case that McIntosh's "prior

convictions and criminal conduct are not evidence of [his] guilt in this case, nor are they

evidence that [he] is a person who is disposed to commit crimes."  (Tr. 737-38).  The

jurors must be presumed to have followed this instruction.  Blueford v. Arkansas, 132 S.

Ct. 2044, 2051 (2012) (citing Weeks v. Angelone, 528 U.S. 225, 234 (2000)).

Accordingly, in the absence of any reason to believe that the jurors may have considered

the evidence regarding McIntosh's prior sexual assaults for an improper purpose, this aspect of McIntosh's ineffectiveness claim also is meritless.

6.     Failure to Object to Court's Charge on Motive

Finally, McIntosh contends that Mr. Turner's representation was ineffective because he failed to object to the court's instruction to the jury that motive was not an element of any of the crimes charged.  (Pet'r's Mem. at 74).  McIntosh alleges that this instruction was erroneous because the attempted witness-elimination murder charge required proof that McIntosh sought to cause Cindy's death "for the purpose of preventing [her] testimony."  (Id. at 74, 102-03).  Justice Marcus instructed the jury with respect to motive as follows:

> While, when a person engages in conduct, his intent concerns what result he means his conduct to have, motive is the reason or reasons which lead him to engage in conduct.  While intent is an essential element of the crimes charged, motive is not an element of any one of them.
>
> In other words, the People have no obligation to prove that the defendant had a reason or reasons to commit a crime.
>
> Nevertheless, if the evidence establishes that the defendant did have a motive to commit a crime or that he did not have a motive, you may consider that motive or lack of motive in your deliberations.
>
> For example, if you find from the proof that the defendant had a motive to commit a charged crime, that's a circumstance you may wish to consider as tending to establish his guilt of that crime.
>
> On the other hand, if you find that the proof establishes the defendant had no motive to commit a charged crime, that's a

49

> circumstance you may wish to consider as tending to establish
> the defendant was not guilty of that crime.

(Tr. 744-45).

With respect to the charge of attempted murder in the first degree, Justice Marcus instructed the jury, insofar as relevant, that

> a death is caused for the purpose of preventing a witness's
> testimony in any criminal action or proceeding when the
> person causing the death does so with a conscious objective of
> preventing the witness from testifying in any criminal action
> or proceeding.

(Id. at 755).  The court further charged the jury that the fourth element of the crime was "that [McIntosh] attempted to cause the death of [Cindy] for the purpose of preventing her from testifying in a criminal action or proceeding."  (Id. at 756).  Under New York law, it would have been proper for Judge Marcus to instruct the jurors, at defense counsel's request, that they could consider McIntosh's motive in determining his intent in relation to the attempted first degree murder charge.  See People v. Rios, 60 N.Y.2d 764 (1983).  Here, however, the court simply delivered a generic instruction concerning motive before further instructing the jurors that the crime of witness-elimination murder required proof beyond a reasonable doubt that McIntosh had tried to kill Cindy so that she would not testify against him.  (Tr. 744-45, 756).  Indeed, the court repeated that specific instruction two additional times in response to jury notes.  (Id. at 797-99, 810-11).  Since the jurors must be presumed to have followed these instructions in the absence of any evidence to the contrary, Blueford, 132 S. Ct. at 2051 (citing Weeks, 528 U.S. at 234),

McIntosh cannot show that he suffered any prejudice as a consequence of the trial court's earlier generic motive charge.

III.     Conclusion

           For the foregoing reasons, the Petition should be denied.

IV.     Notice of Procedure for Filing of Objections to this Report and Recommendation

           The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe, United States District Judge, at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Gardephe.  The failure to file these timely objections will result in a

waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140

(1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

        SO ORDERED.

Dated:      New York, New York
          February 7, 2014

                                    FRANK MAAS
                        United States Magistrate Judge

Copies to Counsel via ECF