UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DION McINTOSH,

                              Petitioner,

          - against -

JAMES CONWAY, Superintendent, Attica
Correctional Facility, and ANDREW M.
CUOMO, New York State Attorney
General,,

                              Respondents.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  10/20/16
```

## ORDER

10 Civ. 175 (PGG)(FM)

PAUL G. GARDEPHE, U.S.D.J.:

        Dion McIntosh has filed a petition for a writ of habeas corpus, pursuant to 28

U.S.C. § 2254.  McIntosh was convicted in Supreme Court of the State of New York, Bronx

County, of attempted murder in the first degree, kidnapping in the first degree, attempted assault

in the second degree, and criminal possession of a weapon in the second degree.  McIntosh is

serving his sentence of 25 years to life imprisonment at the Attica Correctional Facility in Attica,

New York.

        McIntosh contends that his state prosecutors violated Brady v. Maryland, 373

U.S. 83 (1963), in failing to obtain and disclose a "favorable sexual assault lab report."

McIntosh also contends that he received ineffective assistance of counsel at trial.

        On June 29, 2010, this Court referred McIntosh's petition to Magistrate Judge

Frank Maas for a Report and Recommendation ("R & R").  (Dkt. No. 9)  On February 7, 2014,

Judge Maas issued an R & R recommending that this Court deny the petition and decline to issue

a certificate of appealability.  (Dkt. No. 11)  On March 17, 2014, McIntosh filed objections to

Judge Maas's R & R.  (Dkt. No. 21)

## BACKGROUND

On May 14, 2002, McIntosh proceeded to trial before Supreme Court Justice Martin Marcus and a jury in Bronx County on charges of (1) attempted murder in the first degree (intent to cause the death of a police officer); (2) attempted murder in the first degree (witness elimination); (3) attempted murder in the second degree; (4) kidnapping in the first degree, for abducting and restraining a victim for more than twelve hours with the intent to sexually abuse her; (5) criminal use of a firearm in the first degree, and (6) criminal possession of a weapon in the second degree. (Indictment No. 2691-2001)

## I.    THE EVIDENCE AT TRIAL[1]

At approximately 8:30 p.m. on May 19, 2001, in Bridgeport, Connecticut, Cindy[2] – then sixteen years old – was selling marijuana on the street. (Trial Tr. (Dkt. No. 27) at 258-61) She was approached by two strangers, McIntosh and his cousin, Michael Richards, who were in an SUV. (Id. at 263-64; id. (Dkt. No. 26) at 545) They asked for directions to a nightclub, and Cindy entered the SUV to give them directions. (Id. (Dkt. No. 27) at 265-66) Once the group arrived at their destination, Richards left, and McIntosh joined Cindy in the backseat and offered to pay her for sex. (Id. at 267-68, 270-71) Cindy declined, saying that she was "no whore," and then attempted to open the door of the SUV. (Id. at 270-71) Cindy was unable to get out, however, because there were child safety locks on the rear doors of the SUV. (Id. at 271)

McIntosh then pointed a gun at Cindy's face and told her that he would kill her if she made any noise. (Id. at 273) He then instructed her to take off her clothes, put on a condom, and had sexual intercourse with her. (Id. at 274-75) Over the next 26 hours, McIntosh kept

---

[1]  The evidence is discussed in much greater detail in Judge Maas's R & R. (See R & R (Dkt. No. 11) at 2-8)

[2]  The R & R, Respondent's papers, and Petitioner's objections refer to Cindy by her first name only, in order to protect her privacy.

2

Cindy as his prisoner, threatening her with a firearm and forcing her to have sexual intercourse with him two more times – without a condom – and to perform oral sex. (Id. at 272-82) On the morning of May 20, 2001, after he had raped Cindy at gunpoint in Connecticut, McIntosh drove Cindy to his mother's home in Mount Vernon, New York. (Id. at 284-85, 290; id. (Dkt. No. 28) at 440-41) Cindy took a shower and asked McIntosh to permit her to leave, but he refused. (Id. (Dkt. No. 27) at 292-93) McIntosh and Cindy then returned to the SUV, where he struck her on her right forehead with his gun, causing her to lose consciousness. (Id. at 297-99)) She awoke briefly to find McIntosh strangling her with a rope or string.[3] (Id.)

        At approximately 10:40 p.m. on May 20, 2001, Sergeant William Grosskopf of the Village of Pelham Manor Police Department was on routine patrol in a marked police vehicle. He stopped at an empty K-Mart shopping center parking lot on the border of Pelham Manor and the Bronx. (Id. (Dkt. No. 17) at 149, 152, 154, 160-160A) Although all the stores in the shopping center were closed, Grosskopf observed a vehicle parked in the parking lot. The vehicle's alarm had activated, and the vehicle's tail lights were flashing and the horn was beeping. Grosskopf drove over to investigate. (Id. at 154-55)

        As Grosskopf approached the vehicle, McIntosh began walking towards his patrol car. At a distance of about fifteen feet, McIntosh suddenly drew a firearm from his waist and

---

[3] Dr. Susan Ely – a city medical examiner and forensic pathologist – testified at trial that Cindy had been the victim of a "ligature strangulation," and that she would have been rendered unconscious in about "ten or fifteen seconds." (Trial Tr. (Dkt. No. 26) 487, 498-99, 506-07) Dr. Ely also testified that Cindy had sustained an injury above her right eyebrow that was consistent with blunt force trauma – such as being struck with a pistol. (Id. at 510) Cindy's medical records – admitted at trial as People's Exhibit 26 (Trial Tr. (Dkt. No. 27) at 303) – confirmed that she had an abrasion and bruise on her right forehead. (People's Ex. 26 (Medical Records) (Dkt. No. 30) at 12) The jury requested Cindy's medical records during deliberations. (Trial Tr. (Dkt. No. 29) at 809) The People also introduced a photograph showing the contusion on Cindy's right forehead (id. (Dkt. No. 27) at 306-07), and the jury likewise requested this exhibit during deliberations. (Id. (Dkt. No. 29) at 790)

fired one round directly at Grosskopf in his patrol car. (Id. at 155-56) McIntosh then ran toward Eastchester Creek, while Grosskopf made a radio transmission of shots fired, officer needs assistance. (Id. at 158) Grosskopf then pursued McIntosh in his patrol car. As McIntosh fled towards the creek, he periodically stopped, turned, aimed and fired at Grosskopf in his patrol car. McIntosh shot at Grosskopf "at least four more times" until he reached the creek. He then went into the creek, where he was later apprehended by Police Officer David Urban. (Id. at 46, 88-90, 161-64; id. (Dkt. No. 27) at 184, 232-33)

Sergeant Grosskopf then returned to the vehicle in the parking lot – an SUV. Grosskopf and other police officers found Cindy in the back of the SUV, dressed only in her underpants, unconscious and frothing at the mouth, with a sweatshirt string "wrapped around her neck." (Id. (Dkt. No. 17) at 172-73) Cindy's eyes were swollen; her face was bruised; there was blood on her forehead; and there was a "burn mark" around her neck." (Id. at 121-22). Police retrieved, among other items, a used condom from the floor of the left rear passenger area. (Id. (Dkt. No. 28) at 389) A "CrimeScope" examination of the SUV did not reveal the presence of either semen or blood in the SUV's interior.[4] (Id. at 388))

At trial, McIntosh testified that he had shown Cindy his gun in the back of the SUV, but had not threatened her. According to McIntosh, the two had had consensual sex, and he had used a condom. (Id. (Dkt. No. 26) at 547-49) He testified that Cindy told him that she had run away from home and was being pursued, so he took her to his mother's house in Mount Vernon. (Id. at 550-51) He claimed that after they left his mother's house, they begun to have sex a second time, and Cindy had asked him to choke her with a string "to enhance her sexual

---

[4] A "CrimeScope" is "a machine, it has holes at the end, and what it does [is] it's a fluorescent light, and you use different colored lenses. If there is something there[,] let's say semen or blood[,] it should illuminate." (Trial Tr. (Dkt. No. 28) at 388)

4

experience." (Id. at 558)  Cindy lost consciousness while he was choking her, fell, and hit her head on the floor of the SUV, which McIntosh admitted was carpeted.  According to McIntosh, Cindy "got a rug burn" on her forehead as a result of her fall.  (Id. at 558, 587, 591)  McIntosh "panicked," drove around for two-and-a-half hours, and eventually stopped in a parking lot, where he accidentally set off the SUV's car alarm.  (Id. at 558-59, 593-99)  He fired a shot at a tire on Sergeant Grosskopf's patrol car in order to prevent the officer from pursuing him.  He then jumped into the creek.  (Id. at 560-61)

On May 22, 2002, the jury returned its verdict finding McIntosh guilty of attempted murder in the first degree and kidnapping in the first degree with respect to Cindy, attempted assault in the second degree with respect to the shots he fired at Sergeant Grosskopf, and criminal possession of a weapon in the second degree.[5]  (Id. (Dkt. No. 29) at 819-20)  McIntosh was acquitted of attempted murder in the first degree with respect to Sergeant Grosskopf.  (Id. at 819-20)

On July 8, 2002, Justice Marcus sentenced McIntosh to twenty-five years to life imprisonment.  (Sent. Tr. (Dkt. No. 29) at 23-24)

## II.    POST-TRIAL PROCEEDINGS

### A.    The Office of Chief Medical Examiner Report

On July 14, 2004 – two years after McIntosh was sentenced – McIntosh's appellate lawyer, Ellen Dille, contacted New York City's Office of Chief Medical Examiner and requested a copy of the sexual assault laboratory report related to McIntosh's case.  (See Blira-Koessler Declaration (Dkt. No. 7), Ex. 1 (Dille Affirmation) at ¶¶ 157, 160-61; Pet. Appendix (Dkt. No. 14) at A 21-28, 49)  The Medical Examiner's report, which had been prepared by

---

[5] Attempted assault in the second degree is a lesser included offense of attempted murder in the first degree.  (Trial Tr. (Dkt. No. 29) at 793-94)

criminalist Meredith S. Rosenberg on June 20, 2002,[6] indicated that no semen was found on oral

and vaginal swabs of Cindy, although an antigen contained in seminal fluid was found on an anal

swab. (Pet. Appendix (Dkt. No. 14) at A 21, 22, 25)  Semen from a single individual was found

on the inside of the used condom recovered from the SUV. (Id. at A 51-52)  DNA from the same

individual, from a second male, and from Cindy was found on the outside of the condom. (Id. at

A 21-28, 51-52)

### B.   McIntosh's Penal Law § 440.10 Motion

#### 1.   Penal Law § 440.10 Hearing

In 2005, McIntosh filed a motion in state court seeking to vacate his conviction

pursuant to CPL § 440.10(1)(g) and (h).  McIntosh argued that he was entitled to a new trial

based on (1) newly discovered evidence (that is, the Medical Examiner's report); (2) the

prosecution's violation of Brady v. Maryland, in failing to turn over the Medical Examiner's

report; and (3) ineffective assistance of counsel.  In support of McIntosh's motion, Dille

submitted a lengthy affirmation recounting, inter alia, conversations she had with McIntosh's

trial counsel (Barry Turner), with Rosenberg, and with Daniel McCarthy, the prosecutor. (Blira-

Koessler Declaration (Dkt. No. 7), Ex. 1 (Dille Affirmation))  As to Turner, Dille reported that

he had told her that "if he had known that the sex assault test results were negative, he would

have used them at the trial," and that he had "trusted the prosecutor" to give him the results if

they were negative. (Id. at ¶ 146)  Dille also claimed that Turner had "disparaged" McIntosh in

conversations with her, stating "[w]e're all better off that he is where he is." (Id. at ¶ 156)  As to

Rosenberg, Dille stated that she told Dille that no sperm was found in Cindy's vaginal cavity,

and that Rosenberg "was not able to ascertain whether [McIntosh] was the source of [the] semen

---

[6] The Medical Examiner's report was thus not prepared until after the completion of McIntosh's trial on May 22, 2002.

6

[inside the condom] because the police did not submit a sample of his DNA." (Id. at ¶¶ 163-68) As to McCarthy, Dille stated that he had told her that he did not have the results from Cindy's sexual assault kit at the time of trial. (Id. at ¶ 175)

   In opposition to McIntosh's motion, the People submitted affirmations from Turner and McCarthy, and an affidavit from Rosenberg. (Blira-Koessler Declaration (Dkt. No. 7), Ex. 2 (Turner Affirmation); Ex. 2 (Rosenberg Affidavit); Ex. 2 (McCarthy Affirmation)) In Turner's affirmation, he explains that "the agreed trial tactic in Mr. McIntosh's case was that Cindy . . . was a willing participant in their sexual encounters. . . . Since the strategy was to concede the allegation of sexual contact on grounds that it was consensual, it was determined that there was no need to investigate the forensic evidence collected by the police." (Id.) McCarthy confirmed that he had not known of the Medical Examiner's report prior to or during the trial. He also stated that he did not consider the report to be Brady material, but that he would have turned it over to defense counsel as part of discovery because it provided substantial evidence that Cindy and McIntosh had engaged in "at least one act of sexual intercourse using a condom." Rosenberg explained that "a number of factors . . . can lead to a failure to detect semen inside the vaginal cavity of a subject following sexual intercourse," including the subject patient's activities following sexual intercourse and the "positions in which a subject patient may hold herself during or after sexual intercourse." (Id.)

   On January 5, 2006, Justice Marcus conducted a hearing concerning McIntosh's motion. Rosenberg – who was the only witness at the hearing – testified that although Medical Examiner reports are generally faxed to the district attorney's office and the detectives working on a case, the report in McIntosh's case had not been sent to anyone until Dille requested it. (Pet. Appendix (Dkt. No. 14) at A 47-50)

7

Rosenberg also testified that the female DNA profile recovered from the outside of the condom was consistent with Cindy's DNA, and the male DNA profile associated with the semen inside the condom was consistent with McIntosh's DNA. (Id. at A 56-57, 79-80) The second male's DNA profile could not be identified as semen, and could have come from either Cindy's vagina or the floor of the SUV. (Id. at A 76-80, 110)

Although Rosenberg concluded, based on the DNA profiles recovered from the condom, that there had been sexual interaction between Cindy and McIntosh, she "could not say how the DNA was deposited, how many interactions took place or in what sequence, whether unprotected sex had occurred, or whether any actions were consensual." (R & R (Dkt. No. 11) at 15 (citing Pet. Appendix (Dkt. No. 14) at A 83-86, 92-94, 113-16, 121-23)) Rosenberg further testified that the semen on the anal swab was consistent with either unprotected sex or a spill from the used condom. (Pet. Appendix (Dkt. No. 14) at A 83-84))

## 2. Opinion Denying Relief Under Penal Law § 440.10

Justice Marcus denied McIntosh's motion to vacate in a March 13, 2006 opinion. (See Pet. Appendix (Dkt. No. 14) at A 128) He found that the Medical Examiner's report was inconclusive, and that its introduction at trial would not have led to a more favorable outcome for McIntosh. (Id. at A 136-40) Based on Rosenberg's testimony, "the tests were equally consistent with the complainant having engaged in only one act of protected sex; or in one act of protected sex and one of unprotected sex, or in more than one act of each, and none of these possibilities was more probable than another." (Id. at A 140)

Justice Marcus also rejected McIntosh's claim that the presence of another man's DNA on the outside of the condom "would have advanced his argument that the complainant lied about the consensual nature of the charged sexual activities out of fear of jeopardizing her

8

relationship with another person. . . ." (Id. at A 140-41) Cindy had admitted at trial that she was

sexually active, however, and thus McIntosh already had a basis to make his motive argument.

(Id. at A 141) Moreover, the presence of DNA material from a second man was of limited value,

because "the test results were far from conclusive in establishing that the complainant had

recently engaged in sex with someone other than the defendant." (Id.) The DNA from the

second man could have been transferred from the floor of the SUV, for example. (Id.)

> Finally, Justice Marcus stated, "more generally," that he

> found the complainant to be a credible trial witness, and the defendant not
> credible at all. Given the comparative believability of their accounts of the events
> in question, it is clear the test results would neither have sufficiently undermined
> the complainant's testimony nor sufficiently corroborated the defendant's as to
> make a different result a possibility, let alone a probability.

(Id. at A 142) Justice Marcus further stated that the police officers' testimony concerning their

encounter with McIntosh, his shots at them, and their discovery of Cindy in the SUV –

unconscious with a bruised and bloody face – likely had a "devastating effect . . . on the jury's

view of the defendant's claim that the sexual acts were consensual. . . ." (Id.) Justice Marcus

also noted that the immateriality of the Medical Examiner's report was demonstrated by "the fact

that the defendant was convicted in the absence of any DNA evidence corroborating the

complainant's testimony, or contradicting the defendant's, and even in the face of arguments by

trial counsel that the absence of such evidence corroborated the defendant's claim of consensual

sex." (Id.)

As to McIntosh's Brady claim, Justice Marcus found that the People had not

suppressed the Medical Examiner's report, given that the prosecutor obtained the report only

after Dille had obtained a copy. (Id. at A 143-44) "[T]he People cannot be held to have been in

constructive possession of [the Medical Examiner's report], since a Brady violation cannot be

9

based upon documents possessed by [the Office of Chief Medical Examiner], but not by the prosecutor." (Id. at A 144 (citing People v. Stern, 270 A.D.2d 118, 199 (1st Dept. 2000); People v. Wright, 225 A.D.22d 430, 431 (1st Dept. 1996); People v. Washington, 86 N.Y.2d 189, 192 (1995)) Justice Marcus also emphasized that the testing might not have even been completed before trial. (Id.)

Justice Marcus further concluded that – even if he were to find that the Medical Examiner's report had been suppressed – McIntosh had shown no prejudice, because the test results would not have affected the outcome of the case. (Id. at A 146-47) Moreover, McIntosh was as aware of the rape kit and its submission for testing as the prosecution, and he could have requested that the analysis be performed and a lab report prepared prior to trial. (Id. at A 144-45)

McIntosh also claimed that his lawyer at trial had provided ineffective assistance of counsel by: "(1) fail[ing] to investigate the lack of physical evidence of rape; (2) [not familiarizing himself] with the discovery materials and items in evidence, causing him to cross-examine the complainant inadequately and err in his reference to items in evidence; and (3) fail[ing] to understand and argue the law regarding the charges of Attempted Murder in the First Degree and Kidnapping in the First Degree." (Id. at A 147) Justice Marcus rejected all of these claims, finding that – based on the trial record and trial counsel's affidavit – "many of the alleged failings" of McIntosh's attorney "were a product of trial strategy in which he and the defendant agreed." (Id. at A 150) To the extent that McIntosh claimed that he had not agreed to certain strategic decisions – such as the decision not to seek production of the Medical Examiner's report – Justice Marcus found that those decisions fell within the wide discretion that defense counsel is afforded in a criminal proceeding. (Id. at A 151-52)

Justice Marcus further found that the trial strategies that McIntosh criticized were not unreasonable under the circumstances. (Id. at A 152) For example, counsel did not seek production of the Medical Examiner's report because McIntosh had admitted that he and Cindy had had consensual sex. (Id. at A 152) Moreover, although trial counsel did not question Cindy about every inconsistency between her trial testimony and prior statements, he cross-examined and impeached her and all of the remaining prosecution witnesses. (Id. at A 152-53) Justice Marcus found that it was reasonable for trial counsel not to question Cindy about "less significant inconsistencies," as doing so "could have made the complainant appear to be victimized by trial counsel and invoked jury sympathy in her favor." (Id. at A 153)

Justice Marcus also rejected McIntosh's argument that his trial lawyer had been constitutionally ineffective in failing to consult an expert in "manifestations of sexual abuse." (Id. at A 153-54) Justice Marcus noted that – according to McIntosh's appellate counsel – trial counsel had "attempted, without success, to find a medical expert to testify about the use of a ligature during sex" to support defendant's account that Cindy had asked him to place a cord around her neck during sex. (Id. at A 154 (internal quotation marks omitted)) According to Justice Marcus, trial counsel's efforts to "build a plausible case" were "far from ineffective assistance." (Id.)

McIntosh also asserted that his trial counsel was ineffective in failing to introduce certain police reports, to which he referred during closing argument. (Id. at A 154-55) Justice Marcus noted that these police reports contained "information that in other contexts the defendant now claims he did not want re-emphasized to the jury": namely, "a reference to the complainant having possibly been raped and a description of her having been found with a cord around her neck." (Id. at A 155) Justice Marcus found that, considered in context, the failure to

11

introduce these reports was an "isolated act" that did not rise to the level of ineffective

assistance.  (Id.)

                Justice Marcus also rejected McIntosh's argument that trial counsel's failure to

make certain legal arguments about the attempted murder charge constituted ineffective

assistance.  (Id. at A 156)  McIntosh was convicted of attempted murder in the first degree on the

theory that he had attempted to murder Cindy to prevent her from testifying against him.  Under

New York law, the victim of a crime cannot be the witness that a defendant attempts to kill for

purposes of witness-elimination murder, unless the attempted murder is a wholly separate event

from the initial crime.  McIntosh asserted that his lawyer should have argued that the prosecution

had not met its burden, because the attempted murder was not separate from the other alleged

crimes.  As Justice Marcus explained, however,

> [t]hat trial counsel did not raise this particular issue with the jury was consistent
> with his strategy of arguing that no kidnapping had occurred, and that instead the
> complainant had voluntarily accompanied the defendant; that the complainant had
> not been raped or sodomized, and instead had consented to sexual intercourse;
> that the defendant had not attempted to murder the complainant, and had only
> placed the string around the complainant's neck to heighten her sexual
> experience; and that he had not attempted to murder a police officer, but had only
> fired at the police to frighten them away.  Trial counsel emphasized to the jury the
> hours that the complainant had spent with the defendant and the number of
> opportunities to leave she had not taken.

> The technical argument the defendant now insists trial counsel should have made
> to the jury -- that the rapes, kidnapping and attempted murder, were all part of one
> criminal incident -- may have only served to confuse the issues he had so carefully
> tried to narrow for the jury, and might inadvertently have left the jurors with the
> unintended suggestion that he was conceding the possibility that the defendant
> had committed rape, kidnapping and attempted murder, albeit not in the first
> degree.  Asking the Court to find that this choice constitutes ineffective assistance
> of counsel is inviting the Court to engage in exactly the type of second-guessing
> that is specifically to be avoided in determining whether a defendant received
> ineffective assistance of counsel at trial.

(Id. at A 157-58 (footnote omitted))

McIntosh appealed to the Appellate Division, First Department, claiming that (1) New York lacked jurisdiction to prosecute him for kidnapping; (2) the proof was insufficient on the kidnapping charge; (3) the proof was insufficient on the witness-elimination murder charge; (4) trial counsel was ineffective in failing to preserve the sufficiency argument as to the witness-elimination murder charge; (5) the trial court erred in instructing the jury that the prosecution was not required to prove that the defendant had a motive to commit any crime but that proof that he had a "conscious objective" to eliminate Cindy as a witness would satisfy the "for the purpose of" element of the witness-elimination charge, and that his counsel was ineffective in failing to object to this instruction; (6) trial counsel was ineffective in failing to conduct a pretrial investigation, in using available discovery material to substantiate defense claims, and in make legal arguments to the trial judge; (7) the prosecution violated Brady in failing to disclose the Medical Examiner's report to the defendant; and (8) the lower court erred in denying McIntosh's motion for forensic testing of Cindy's clothing and other evidence recovered from the SUV pursuant to CPL § 440.30(1-a). (See Blira-Koessler Declaration (Dkt. No. 7) at Ex. 3 (Def. Appellate Br.))

On June 12, 2008, the First Department affirmed Justice Marcus's order. People v. McIntosh, 53 A.D.3d 1, 7 (1st Dept. 2008). As to McIntosh's insufficiency argument on the witness-elimination murder count, the court found that this issue had not been preserved. In the alternative, the court found that the evidence was sufficient, because there was a "prolonged break in time, a change of localities, and the formation of distinct criminal intentions" between the rapes and the attempted murder. McIntosh, 53 A.D.3d at 4-6. The court also rejected McIntosh's ineffective assistance of counsel claims, finding that trial counsel's challenged actions constituted "reasonable strategic decisions" and that, even if they were not reasonable,

13

McIntosh was not prejudiced. Id. at 6.  Finally, the court rejected McIntosh's Brady argument

concerning the non-disclosure of the Medical Examiner's report, finding that (1) the Medical

Examiner's report was not subject to disclosure; and (2) the non-disclosure could not have

affected the jury's verdict. Id. at 7.

McIntosh sought leave to appeal.  The New York Court of Appeals denied leave

on October 30, 2008. People v. McIntosh, 11 N.Y.3d 833 (2008).

### III.    McIntosh's Habeas Petition and Judge Maas's Report and Recommendation

McIntosh filed a petition for a writ of habeas corpus on January 11, 2010.[7]

McIntosh argues that (1) the Bronx District Attorney's Office violated its duty under Brady to

disclose the Medical Examiner's report; and (2) he received ineffective assistance of counsel,

because his lawyer did not investigate the forensic evidence, did not use available documents to

support defense arguments, did not effectively impeach the complainant, and did not make

appropriate legal arguments and objections. (Dkt. Nos. 2, 3)  On June 29, 2010, after briefing

was complete, this Court referred the petition to Magistrate Judge Maas for an R & R. (Dkt. No.

9)

Judge Maas issued an R & R on February 7, 2014.  (Dkt. No. 11)  As to

McIntosh's Brady claim, Judge Maas found that the Medical Examiner's report was not

favorable to McIntosh, because the report's findings were "equally consistent" with McIntosh's

account and Cindy's account.  (Id. at 30-32)  Moreover, to the extent that this evidence

---

[7] The Antiterrorism and Effective Death Penalty Act's one-year statute of limitations began to
run after McIntosh's time to petition for a writ of certiorari elapsed.  McIntosh had ninety days
after the Court of Appeals issued its October 30, 2008 order denying leave to appeal to file a
petition for a writ of certiorari. (R & R (Dkt. No. 11) at 27 n. 12 (citing S. Ct. R. 13(1); Williams
v. Artuz, 237 F.3d 147, 150 (2d Cir. 2001))  Ninety days after the Court of Appeals' decision is
January 28, 2009.  Because McIntosh filed his habeas petition on January 11, 2009, his petition
was timely filed.

confirmed Cindy's account that she and McIntosh had had sex, it tended to confirm that

McIntosh had a sexual motive for the kidnapping. (Id. at 32 (citing Blira-Koessler Declaration

(Dkt. No. 7), Ex. 2 (McCarthy Affirmation) at ¶ 10)) Judge Maas rejected McIntosh's

"speculative" argument that the presence of a second man's genetic material on the condom

would have helped his case. (Id. at 32) Given Rosenberg's testimony that "the source of that

[genetic] material could have been something other than semen," the presence of the material on

the condom "scarcely would have proven that Cindy had recently had intercourse with another

man, much less that she currently was in a relationship that she was seeking to protect by falsely

accusing McIntosh of kidnapping and rape." (Id.)

        Judge Maas also concluded that the state court had not unreasonably applied

established law in finding that the Medical Examiner's report had not been suppressed. (R & R

(Dkt. No. 11) at 32-34) First, Judge Maas found that "the Appellate Division's determination

that the prosecutor in this case could not be accused of having improperly withheld the [Medical

Examiner's] Report arguably was correct," because Chief Medical Examiner's Office "is an

independent agency not within a prosecutor's control. . . ." (Id. at 33 (citing Washington, 86

N.Y.2d at 192)) Moreover, "defense counsel was aware that the rape kit existed and had been

submitted for testing and, therefore, could himself have requested that a report be prepared prior

to trial." Given these circumstances, the Medical Examiner's report "cannot be considered

improperly withheld." (Id. (citing United States v. Paulino, 445 F.3d 211, 225 (2d Cir. 2006))

        Judge Maas further concluded that the state courts had reasonably determined that

– had the Medical Examiner's report been disclosed – there was not a "reasonable probability" of

a different outcome at trial. (R & R (Dkt. No. 11) at 34-35) Judge Maas explained that given the

"abundant evidence" of McIntosh's guilt, it was unlikely that an inconclusive DNA report would

have led to a different verdict. (Id. at 34)  In reviewing the evidence, Judge Maas noted that

Cindy had been discovered in McIntosh's car "strangled, unconscious, and wearing only her

underpants"; that she had significant injuries, including "swelling and bruising to her forehead,"

"petechial hemorrhages left on her face," and a wound on her neck; that McIntosh brought Cindy

"to a remote area near a creek" instead of a hospital when she became unconscious; and that

McIntosh "fire[d] his gun at Sgt. Grosskopf repeatedly as he fled."  (Id. at 34-35)

        Judge Maas also rejected McIntosh's ineffective assistance of counsel arguments.

(See id. at 36)  Judge Maas began his analysis by noting that McIntosh – in order to obtain

habeas relief – would have to (1) overcome the "'strong presumption that [his lawyer's] conduct

falls within the wide range of reasonable professional assistance,'" (id. (citing Strickland v.

Washington, 466 U.S. 668, 689 (1984)), and (2) "show that the state courts 'applied Strickland to

the facts of his case in an objectively unreasonable manner.'"  (Id. at 37 (quoting Bell v. Cone,

535 U.S. 685, 699 (2002))

        After citing these "highly deferential" standards of review (id. (quoting

Harrington v. Richter, 562 U.S. 86, 105 (2011)), Judge Maas then analyzed McIntosh's

complaints that his lawyer had not investigated the forensic evidence, had not used discovery

materials to support defense arguments, had not effectively impeached Cindy, and had not made

appropriate legal arguments and objections.  (See Pet. Br. (Dkt. No. 3) at 73-110)

        As to McIntosh's complaint regarding forensic evidence, Judge Maas concluded

that it was "perfectly reasonable" for trial counsel not to seek forensic evidence, given that

McIntosh's defense was that Cindy had consented to sex.  "[P]hysical evidence substantiating

that fact was not material to his defense."  (R & R (Dkt. No. 11) at 39)  Moreover, the results set

forth in the Medical Examiner's report were unlikely to, and did not, "illuminate[] the question

16

of consent." (Id.) In any event, trial counsel had used the lack of a Medical Examiner's report to McIntosh's advantage at trial, arguing in summation that "the prosecution's failure to put forth any forensic evidence . . . was a significant gap in the People's case." (Id. at 40 (citing Trial Tr. (Dkt. No. 16) at 645-46))

Judge Maas also rejected McIntosh's argument that his lawyer should have retained an expert to testify about the use of crimescopes and "physical manifestations of sexual contact." (Id.) Noting that "[e]ffective assistance does not require counsel to scour the earth for an expert who may not exist" (id. at 40), Judge Maas concluded that McIntosh had not demonstrated that expert testimony would have changed the outcome at trial. (Id. at 41) As to the negative crimescope evidence, Judge Maas noted that there was "absolutely no evidence . . . that McIntosh [had] ejaculated during any episode of unprotected intercourse or oral sex with Cindy"; accordingly, the negative crimescope findings were consistent with both Cindy's account and McIntosh's testimony. (Id.) Moreover, Cindy had testified that McIntosh repeatedly forced her to have sex while threatening her with a gun, and that accordingly she had not "physically resisted [McIntosh's] demands for sex." (Id.) "In these circumstances, McIntosh's hypothesis that the testimony of an expert regarding the physical manifestations of sexual contact would have been helpful to him amounts to sheer speculation." (Id. at 41-42 (citing Maddox v. Lord, 818 F.2d 1058, 1062 (2d Cir. 1987); Muhammad v. Bennett, No. 96CIV.8430(JSR)(HBP), 1998 WL 214884, at *1 (S.D.N.Y. Apr. 29, 1998)))

Judge Maas also rejected McIntosh's claim that his lawyer had not properly used discovery materials, noting that McIntosh's arguments were made "[w]ith 20-20 hindsight." (Id. at 42)

17

As to counsel's cross-examination of Cindy, Judge Maas noted that McIntosh's lawyer had attacked Cindy's credibility throughout the trial, and that he was not required to cross-examine Cindy about every prior inconsistent statement in order to provide effective assistance. Indeed, "a scorched earth approach could have led the jury to be even more sympathetic toward her." (Id. at 43-44)

As to McIntosh's complaint that his lawyer had alluded – in his summation – to police reports that were not in evidence, Judge Maas agreed with Justice Marcus's determination that this error was inconsequential, because the police reports "did not contain any information [that was] unknown to the jurors." (Id. at 44-45)

Judge Maas also considered McIntosh's claim that his lawyer had failed to make appropriate legal arguments at trial. McIntosh argues that "the prosecutor's theory that New York had jurisdiction over the kidnapping charge because the crime began in Connecticut but continued in New York was inconsistent with the 'prior crime' element of the attempted witness-elimination murder charge." (Id. at 45 (citing Pet. Br. (Dkt. No. 3) at 98-102)) According to McIntosh, his lawyer should have moved to dismiss the kidnapping charge based on that inconsistency, and also made this argument in summation. (Id.) As to the alleged inconsistency, Judge Maas noted that both Justice Marcus and the Appellate Division had rejected McIntosh's argument, demonstrating that he suffered no prejudice from his lawyer's failure to raise this argument at trial. (Id. at 45-46) As to McIntosh's claim that the inconsistency point should have made during summation, Judge Maas agreed with Justice Marcus that trial counsel might reasonably have been hesitant to make such a "'technical'" argument to the jury, which might have interpreted the argument as a concession that a kidnapping and an attempted murder had taken place. (Id. at 46-47)

18

Judge Maas also rejected McIntosh's claim that his lawyer should have sought a jury instruction stating that evidence of uncharged sexual acts could be considered only in connection with McIntosh's motive for committing first-degree kidnapping. (Id. at 47-48) McIntosh's proposed limiting instruction was too restrictive, because – as the Appellate Division explained – the prosecution's first-degree murder theory was "'that [McIntosh] tried to kill [Cindy] in New York in order to prevent her from testifying as a witness to the sexual assaults committed in Connecticut the previous day.'" (Id. at 48 (citing McIntosh, 53 A.D.3d at 5))

Finally, Judge Maas rejected McIntosh's claim that his lawyer should have objected to the court's instruction that motive was not an element of any of the crimes charged. (Id. at 49) McIntosh argues that – because the attempted murder charge required proof that McIntosh sought to cause Cindy's death "'for the purpose of preventing [her] testimony'" – the motive charge was erroneous. (Id.)

After reviewing Justice Marcus's jury instructions as a whole, however, Judge Maas determined that Justice Marcus's "generic instruction concerning motive" – in which he differentiated between motive and intent – caused no prejudice. Justice Marcus repeatedly instructed the jury – as to the first degree attempted murder charge involving Cindy – that the jury had to find that the acts were committed "for the purpose of preventing the intended victim's testimony in any criminal action or proceeding. . . ." (Id. at 50; see also Trial Tr. (Dkt. No. 16) at 754-55; id. at 756 (listing the elements of the attempted murder witness-elimination charge: (1) "that on or about May 20, 2001, in the County of the Bronx the defendant strangled Cindy"; (2) "that the defendant did so with intent to cause the death of [Cindy]"; (3) "that [Cindy] was a witness to a crime committed on a prior occasion"; (4) "that the defendant attempted to cause the

death of [Cindy] for the purpose of preventing her from testifying in a criminal action or proceeding. . . ."))

Judge Maas concluded that under these circumstances, "McIntosh cannot show that he suffered any prejudice as a consequence of the trial court's earlier generic motive charge." (R&R at 51)

Having carefully considered each of McIntosh's arguments, Judge Maas recommended that McIntosh's petition be denied. (Id.)

Judge Maas instructed the parties to file any objections within fourteen days. (Id. at 51-52) On February 19, 2014, McIntosh requested a one-month extension of the deadline to file objections to the R & R. (Dkt. No. 19) This Court granted the extension request. (Dkt. No. 20) McIntosh filed his objections on March 17, 2014. (Dkt. No. 21)

## DISCUSSION

In evaluating an R & R from a Magistrate Judge, a district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Where, as here, a timely objection has been made to a Magistrate Judge's recommendations, "[the district court judge] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. "'[T]o the extent . . . that the [objecting] party makes only conclusory or general arguments, or simply reiterates the original arguments, the Court will review the [R & R] strictly for clear error.'" DiPilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 339 (S.D.N.Y. 2009) (quoting IndyMac Bank, FSB v. Nat'l Settlement Agency. Inc., No. 07 Civ. 6865(LTS)(GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008)).

## I.   **LEGAL STANDARD**

Although this Court reviews McIntosh's objections to the R & R de novo, the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d),

requires a district court to give deference to state court decisions on the merits. Harrington, 562

U.S. at 101 ("A state court must be granted a deference and latitude that are not in operation

when the case involves [direct] review [of a criminal convictions.]").

Under Section 2254(d),

[a]n application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to any
claim that was adjudicated on the merits in State court proceedings unless the
adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme
Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the
facts in light of the evidence presented in the State court proceeding.

Under Section 2254(d)(1), "'an unreasonable application of federal law is

different from an incorrect application of federal law.'" Harrington, 562 U.S. at 101 (quoting

Williams v. Taylor, 529 U.S. 362, 410 (2000)) (emphasis in Williams). "A state court's

determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

jurists could disagree' on the correctness of the state court's decision." Id. (quoting Yarborough

v. Alvarado, 541 U.S. 652, 664 (2004)). "Clearly established federal law 'refers to the holdings,

as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-

court decision.'" Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (quoting Kennaugh v.

Miller, 289 F.3d 36, 42 (2d Cir. 2002) (internal quotation marks and alterations omitted)).

21

McIntosh raises here the same arguments that he made to the Appellate Division. Because that court addressed McIntosh's arguments on the merits, its determinations are entitled to deference. Friedman v. Rehal, 618 F.3d 142, 153 (2d Cir. 2010) (explaining that the standard of review for state court decisions under § 2254(d) – "'[u]nreasonable application of[] clearly established Federal law'" – is even more deferential than "clear error" review (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003))).

## II.   *BRADY* VIOLATION CLAIM

"There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). This Court concludes that McIntosh has not demonstrated either that the People suppressed the Medical Examiner's report or that he suffered prejudice as a result of the non-disclosure of the Medical Examiner's report.

### A.   The State Did Not Suppress the Medical Examiner's Report

McIntosh argues that Judge Maas erred in determining that the Medical Examiner's report was not "improperly withheld." (Pet. Objections (Dkt. No. 21) at 5-10) As discussed above, Judge Maas concluded that the State had not suppressed the Medical Examiner's report, both because the Medical Examiner's Office is an independent agency, and because defense counsel was aware that a rape kit had been submitted for analysis to the Medical Examiner, and defense counsel could have requested the Medical Examiner's report himself. (R & R (Dkt. No. 11) at 32-34) Relying on Banks v. Dretke, 540 U.S. 668 (2004), however, McIntosh argues that a defendant has no "burden to discover Brady material if he is aware of the

'potential existence' of such evidence." (Pet. Objections (Dkt. No. 21) at 8 (citing Banks, 540

U.S. at 696))

        In Banks, the State – which had assured the defense counsel that it would produce

all Brady material – "did not disclose that one of [its critical] witnesses was a paid police

informant. . . ." Banks, 540 U.S. at 674-75. The State also permitted this witness to testify on

cross-examination – without correction – that he had "'[n]ever taken any money from . . . police

officers.'" Id. at 678. In concluding that Banks had shown "cause" for failing to raise this issue

in state court, the Supreme Court rejected the State's argument that Banks' "failure, during state

postconviction proceedings, to 'attempt to locate [the witness] and ascertain his true status,' or to

'interview the investigating officers . . . to ascertain [his] status,' undermines a finding of cause .

. . ." Id. at 695. The Court noted that defense counsel had no reason to "'suspect[] that

additional impeaching evidence was being withheld,'" id. (quoting Strickler, 527 U.S. at 285),

and emphasized that "defendants [need not] scavenge for hints of undisclosed Brady material

when the prosecution represents that all such material has been disclosed." Id. The Court went

on to find that the impeaching evidence had been suppressed, that Banks had been prejudiced by

this non-disclosure, and that he was not precluded from gaining federal habeas relief by virtue of

his failure to produce evidence of the witness's paid informant status in related state court

proceedings. Id. at 698-703.

        Banks does not assist Petitioner here, for multiple reasons. As an initial matter,

Banks involves a prosecutor's knowing withholding of impeachment evidence. There are no

such facts here. There is no claim that the Bronx District Attorney's Office had the Medical

Examiner's report or that it was aware of its contents prior to McIntosh's lawyer obtaining the

report. See Blira-Koessler Declaration (Dkt. No. 7), Ex. 1 (Dille Affirmation) at ¶ 171 (stating

that the records of the Chief Medical Examiner's Office "reveal that neither the prosecutor nor defendant's trial attorney inquired about the results of the sexual assault kit").

Banks also does not alter well settled law that no Brady violation takes place where, as here, a defendant (1) knows of the existence of the evidence in question, and (2) has equal access to it. See, e.g., Bell v. Bell, 512 F.3d 223, 235-36 (6th Cir. 2008) ("Banks . . . do[es] not counsel a conclusion that there was a Brady violation with respect to the nondisclosure of [public] sentencing records," because Banks "involve[d] information known to investigating officers that defendants had no reason to know about and that could not have been discovered by defendants without an extensive and possibly fruitless investigation"); Maharaj v. Sec'y for Dep't of Corrs., 432 F.3d 1292, 1315 n.4 (11th Cir. 2005) (distinguishing Banks where "the prosecution did not physically possess the documents Petitioner sought, and it made no false or misleading statements regarding what that evidence might show or where it might be found"; noting that "[w]hen the defendant has 'equal access' to the evidence disclosure is not required"); Pfaff v. United States, 989 F. Supp. 2d 301, 310 (S.D.N.Y. 2013) ("It remains the law [after Banks] that a defendant who 'knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence' cannot prevail on a claim of a Brady/Giglio violation." (quoting United States v. Gaggi, 811 F.2d 47, 59 (2d Cir. 1987))).

Indeed, post-Banks, the Second Circuit has reiterated the "frequently recognized" rule that "'[e]vidence is not considered to have been suppressed within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence.'" Paulino, 445 F.3d at 225 (quoting United States v. Gonzalez, 110 F.3d 936, 944 (2d Cir. 1997)); see also United States v. Jackson, 345 F.3d 59, 73 (2d Cir. 2003) ("We recognize an exception to the disclosure obligation where 'the

defendant or his attorney "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence."" (quoting United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995) (quoting United States v. Zackson, 6 F.3d 911, 918 (2d Cir.1993)))).

Here, as Judge Maas found, (R & R (Dkt. No. 11) at 33), McIntosh's trial counsel had all the information necessary to pursue and take advantage of the Medical Examiner's report. Indeed, McIntosh does not dispute that his lawyer "was aware that the rape kit existed and had been submitted for testing" or that he "could himself have requested that a report be prepared prior to trial." (R & R (Dkt. No. 11) at 33; see also Blira-Koessler Declaration (Dkt. No. 7), Ex. 1 (Dille Affirmation) at ¶ 171 (noting that Chief Medical Examiner's Office "does not notify either the prosecution or the defense regarding preliminary test results," but that if counsel for either side contacts the Office, it "will freely discuss the findings")) And McIntosh's appellate lawyer was, of course, the first attorney to contact the Medical Examiner about its report concerning the rape kit, and that inquiry did not come until 2004 – two years after trial . (See Pet. Appendix (Dkt. No. 14) at A 50-51; Blira-Koessler Declaration (Dkt. No. 7), Ex. 1 (Dille Affirmation) at ¶¶ 157, 171) Under these circumstances, the Bronx District Attorney's Office was not under any obligation to ensure that the Medical Examiner's Office produced a report concerning the rape kit prior to trial, and disclosed that report to defense counsel prior to trial. See United States v. Hsu, 669 F.3d 112, 117 n.2 (2d Cir. 2012) (rejecting claim that government withheld exculpatory emails and bank records because, if such materials existed, the defendant "was aware of them[] and was in a position to subpoena them for trial").

McIntosh argues, however, that he was not aware of the substance of the Medical Examiner's report, and thus did not know that he should seek it out. (Pet. Objections (Dkt. No. 21) at 10) But this Court need not find – in order to reject McIntosh's Brady claim – that

McIntosh was aware of the substance of a report that had not yet been prepared. It is enough that McIntosh knew that the rape kit had been submitted to the Medical Examiner's Office, and that his lawyer could have requested that a report be prepared – prior to trial – if he deemed that useful to McIntosh's defense. As McIntosh's lawyer explains in his affirmation, "[s]ince [McIntosh's] strategy was to concede the allegation of sexual contact on grounds that it was consensual, it was determined that there was no need to investigate the forensic evidence collected by the police." (Pet. Appendix (Dkt. No. 14) at A29 (Turner Affirmation))

In sum, McIntosh knew that the Medical Examiner's Office would analyze the rape kit and that a report could be obtained prior to trial. He chose not to pursue this option because his trial strategy was to concede sexual relations, but to argue that the sex was consensual. Given these circumstances, McIntosh was sufficiently aware of the "essential facts" to be able to "take advantage of th[e] evidence [at issue]." Paulino, 445 F.3d at 225; see United States v. Rigas, 583 F.3d 108, 125-26 (2d Cir. 2009) (no Brady violation where the government did not produce notes from witness interviews where the defendants knew of the witness's role and the facts about which he could testify).[8]

Because the record demonstrates that the Bronx District Attorney's Office did not suppress the Medical Examiner's report, McIntosh's Brady claim fails.

## B.    Prejudice

McIntosh also objects to Judge Maas's finding that he suffered no prejudice from the non-disclosure of the Medical Examiner's report, arguing that he erroneously afforded the

---

[8]  McIntosh also contends that the District Attorney's Office had an obligation to ensure that the Medical Examiner's report was completed prior to trial. (Pet. Objections (Dkt. No. 21) at 7) The New York Court of Appeals has held, however, that "the duties of [the Office of Chief Medical Examiner] are, by law, independent of and not subject to the control of the office of the prosecutor, and [that] the [Medical Examiner's Office] is not a law enforcement agency." Washington, 86 N.Y.2d at 192.

state courts' factual determinations a "presumption of correctness" that they are not due under the AEDPA. (Pet. Objections (Dkt. No. 21) at 15-16) McIntosh also complains that Judge Maas "failed to address the dispositive question of whether the state courts' 'no prejudice' conclusions were an unreasonable application of clearly-established Federal law." (Id. at 16) Lastly, McIntosh contends that Judge Maas applied the wrong standard in considering the prejudice issue: Judge Maas concluded that disclosure of the Medical Examiner's report "'would not have led to a different verdict,'" whereas McIntosh argues that Judge Maas should have considered whether there was a "reasonable probability" that disclosure of the report would have led to a different verdict. (Pet. Objections (Dkt. No. 21) at 17 (emphasis omitted))

McIntosh's claim that Judge Maas applied the wrong legal standard is easily dispatched. The difference in language McIntosh cites presents a purely semantic distinction. Judge Maas cites the state courts' findings that there was not a "reasonable probability" or a "reasonable possibility" that disclosure of the Medical Examiner's report would have changed the verdict, and then states that he agrees with these findings, given the "abundant evidence" of McIntosh's guilt. (See R & R (Dkt. No. 11) at 34-35)

Judge Maas then carefully reviewed that evidence. Noting the swelling and bruising to Cindy's forehead and her other physical injuries – demonstrated not just by Cindy's testimony but also by (1) the testimony of the police officer who discovered her – bruised and battered, naked, unconscious and frothing at the mouth – in McIntosh's SUV; (2) Cindy's medical records (PX 26; see Trial Tr. (Dkt. No. 27) at 303); (3) Dr. Ely's testimony, and (4) the photograph depicting her face (PX 16; see Trial Tr. (Dkt. No. 27) at 306-07) – Judge Maas concluded that McIntosh's tale of a consensual sexual encounter – "which featured strangulation" – "verged on the ludicrous." (R & R (Dkt. No. 11) at 34-35) McIntosh's

involvement in criminal conduct was also confirmed by his reaction to the arrival of Sergeant Grosskopf, at whom he fired four or five shots before jumping into a nearby creek. Given this overwhelming evidence, this Court agrees with Judge Maas's conclusion – and with the conclusions of the state courts – that there is no reasonable probability that disclosure of the Medical Examiner's report would have led to a different outcome.

The Medical Examiner report is, of course, inconclusive as to what took place between McIntosh and Cindy. As Meredith Rosenberg – the author of the report – testified at the motion to vacate hearing, the DNA material found on the used condom confirmed that there had been a sexual encounter between Cindy and McIntosh. But Rosenberg "could not say how the DNA was deposited, how many interactions took place or in what sequence, whether unprotected sex had occurred, or whether any actions were consensual." (Id. at 15 (citing Pet. Appendix (Dkt. No. 14) at A 83-86, 92-94, 113-16, 121-23)) Moreover, although the vaginal swabs tested negative for semen, Cindy's testimony that she took a shower after she was assaulted could explain the lack of semen. (Pet. Appendix (Dkt. No. 14) at A 57-58) In sum, given the overwhelming nature of the evidence against McIntosh and the inconclusive nature of the Medical Examiner's report, there is no reason to believe that disclosure of the report prior to trial would have led to a different outcome.[9]

---

[9] McIntosh's argument that the report would have had significant impeachment value in cross-examining Cindy is not persuasive, because nothing in the report directly contradicts her account. Moreover, defense counsel had ample material on which to cross-examine Cindy and fully utilized that material, questioning her about (1) her history of drug abuse and her use of marijuana on the day of the incident; (2) her sale of crack cocaine and arrests for selling crack; (3) her "sexual awareness" at age sixteen; (4) the fact that she had run away from home at age 11; and (5) her flight from a group home. (Trial Tr. (Dkt. No. 27) at 308-13, 318, 326-27) "'[A] new trial is generally not required [for a Brady violation] . . . when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'" Jackson, 345 F.3d at 74 (quoting Payne, 63 F.3d at 1210). Accordingly, even if the Medical Examiner's report had been suppressed in violation of

28

In sum, McIntosh's <u>Brady</u> claim also fails because he has not demonstrated that he suffered prejudice as a result of the non-disclosure of the Medical Examiner's Report.

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

McIntosh claims that his trial counsel was constitutionally ineffective because he failed to: (1) investigate the forensic evidence and obtain the Medical Examiner's report; (2) consult and retain certain expert witnesses; (3) familiarize himself with and utilize discovery documents to substantiate defense arguments and cross-examine Cindy; (4) move to dismiss the charges of attempted murder in the first degree and kidnapping in the first degree on the theory that key elements were not established and, failed to make this same argument to the jury; (5) request a limiting instruction regarding the jury's consideration of sex crimes McIntosh committed in Connecticut; and (6) object to a jury instruction stating that motive was not an element of any of the crimes charged. (Pet. Br. (Dkt. No. 3) at 87-110)  Judge Maas rejected each of these arguments (R & R (Dkt. No. 11) at 36-51), and McIntosh objects to each of these findings. (Pet. Objections (Dkt. No. 21) at 21-34)

To establish that the Sixth Amendment right to effective assistance of counsel has been violated, a petitioner must show that he meets both prongs of the test established in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, "a convicted defendant must show both (a) 'that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms,' and (b) 'that the deficient performance prejudiced the defense,' i.e., 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (internal citations

---

Brady – contrary to this Court's finding – McIntosh suffered no prejudice from that non-disclosure given the inconclusive nature of that report and the wealth of other cross-examination material available to the defense,

omitted) (quoting <u>Strickland</u>, 466 U.S. at 687-88). "In gauging the deficiency, the court must be

'highly deferential,' must 'consider[] all the circumstances' must make 'every effort . . . to

eliminate the distorting effects of hindsight,' and must operate with a 'strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance. . . .'"

<u>Lindstadt v. Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001) (quoting <u>Strickland</u>, 466 U.S. at 688-89).

As Judge Maas noted, "[t]he application of these two 'highly deferential' standards" – that is, the

deferential habeas standard under the AEDPA and the deferential <u>Strickland</u> standard – "means

that 'the question is not whether counsel's actions were reasonable,' but 'whether there is any

reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.'" (R & R (Dkt.

No.11) at 37 (quoting <u>Harrington</u>, 562 U.S. at 105)

### A.    Failure to Investigate Forensic Evidence

McIntosh objects to Judge Maas's finding that his lawyer was not ineffective in

failing to investigate the forensic evidence. McIntosh argues that physical evidence is of

particular importance in cases involving rape, and that it was unreasonable for his attorney not to

seek out the Medical Examiner's report. (Pet. Objections (Dkt. No. 21) at 23-25, 24 n.6)

McIntosh also contends that Judge Maas erred in finding that the Medical Examiner's report was

not material, because – according to McIntosh – it supports his testimony about the number of

times he and Cindy had sex and whether they used a condom. (<u>Id.</u> at 23, 27)

As discussed above, given that McIntosh and his lawyer pursued a "consent

strategy" at trial, the state courts did not err in finding that the lawyer's decision not to focus on

the forensic evidence – which would be relevant only to whether sex occurred, not whether it

was consensual – was not unreasonable. Attorneys are not required to seek out every piece of

evidence that could conceivably strengthen a client's case. "An attorney can avoid activities that

appear distractive from more important duties," and is "entitled to formulate a strategy that [is]

reasonable at the time and to balance limited resources in accord with effective trial tactics and

strategies." Harrington, 562 U.S. at 107 (internal quotation marks and citations omitted).

Pursuing the forensic evidence also posed "serious risks" for the defense: namely, that

McIntosh's story could have been "exposed as an invention." Id. at 108 (noting that "[a]n

attorney need not pursue an investigation that would be fruitless, much less one that might be

harmful to the defense").

     In any event, even if trial counsel could be found to have acted unreasonably in

failing to pursue the forensic evidence, as discussed above, McIntosh cannot establish that he

was prejudiced by this failure. Given that both Cindy and McIntosh testified that sex had

occurred, the fact that the Medical Examiner's report confirmed this fact was not significant.

While the report did reveal that no semen was found in Cindy's vagina, this could be explained

by the fact that she took a shower after she was assaulted. Given these circumstances, McIntosh

has not shown that the state courts erred in finding that there was no "reasonable probability that

. . . the result of the proceeding would have been different" if trial counsel had pursued the

forensic evidence. Strickland, 466 U.S. at 694.

  **B.**  **Failure to Consult and Retain Experts**

     McIntosh argues that his lawyer should have called an expert to testify about

negative crimescope findings. Judge Maas found that such testimony would not have materially

aided McIntosh, because "[t]here was absolutely no evidence [] that McIntosh ejaculated during

any episode of unprotected intercourse or oral sex with Cindy." Accordingly, the negative

crimescope findings were consistent with both Cindy and McIntosh's testimony, as Rosenberg

testified at the motion to vacate hearing. (R & R (Dkt. No. 11) at 41) Rosenberg also testified

that she "could not say for certain" whether it would even be "likely" that two people engaging

in sexual intercourse would leave bodily fluids from that encounter. (Pet. Appendix (Dkt. No.

14) at A 74) Given this record, there is no reason to believe that testimony from a crimescope

expert would have assisted McIntosh at trial, much less that such testimony would have had a

material effect on the outcome.

McIntosh also argues that his counsel was ineffective in "fail[ing] to even

mention the important negative crimescope findings in his summation, much less hammer home

the disconnect between Cindy's claim that McIntosh subjected her to multiple acts of

unprotected sex in the back of the SUV and the crime scene detective's negative crimescope

findings." (Pet. Objections (Dkt. No. 21) at 28) Defense counsel attacked Cindy's credibility

throughout his summation, however, and – because a jury's attention span is not infinite – he had

to make tactical decisions about how to best impeach her credibility. (See Trial Tr. (Dkt. No. 16)

at 657-670) This Court will not second-guess trial counsel's summation strategy:

> [D]eference to counsel's tactical decisions in his closing presentation is
> particularly important because of the broad range of legitimate defense strategy at
> that stage. Closing arguments should sharpen and clarify the issues for resolution
> by the trier of fact, but which issues to sharpen and how best to clarify them are
> questions with many reasonable answers. . . . Judicial review of a defense
> attorney's summation is therefore highly deferential – and doubly deferential
> when it is conducted through the lens of federal habeas.

Yarborough v. Gentry, 540 U.S. 1, 6 (2003) (internal quotation marks and citations omitted).

Accordingly, McIntosh's counsel was not constitutionally ineffective in failing to call an expert

concerning the crimescope findings, and in not emphasizing the crimescope evidence in

summation.

McIntosh also complains that his lawyer should have found an expert to testify

about the use of a ligature to enhance sexual experience. As Judge Maas noted, however,

32

"[e]ffective assistance does not require counsel to scour the earth for an expert who may not exist." (R & R (Dkt. No. 11) at 40; see also Harrington, 562 U.S. at 106 (state courts have "wide latitude" in determining whether counsel is ineffective for failing to consult or rely on experts)) McIntosh did not object to Judge Maas's finding on this point, and – in any event – this Court finds no error in Judge Maas's determination.

### C.    Failure to Utilize Discovery Documents

McIntosh complains that his lawyer did not to use all available discovery materials to impeach Cindy. (Pet. Objections (Dkt. No. 21) at 28-29) He argues that Judge Maas erred in accepting trial counsel's assertion that his use of discovery materials reflects strategic decisions. (Id. at 29-30)

McIntosh's argument misses the point of Judge Maas's finding: defense counsel's behavior at trial – including his extensive use of Cindy's prior inconsistent statements – plainly illustrates that he had carefully reviewed the discovery materials and made strategic decisions about which impeachment evidence would be most effective. (See R & R (Dkt. No. 11) at 42) In impeaching Cindy, counsel had to avoid appearing overly aggressive, because a contrary strategy could make Cindy more sympathetic to the jury. (Id. at 43-44) Judge Maas, further concluded that McIntosh's complaints about defense counsel's cross of Cindy are based on "20-20 hindsight" (id. at 42), and violate the rule that trial counsel's strategic decisions must be afforded extreme deference. See Strickland, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.").

33

In any event, the examples that McIntosh cites to demonstrate his lawyer's alleged incompetence are not convincing. For example, McIntosh complains that his lawyer should have impeached Cindy's testimony that she did not smoke marijuana while at McIntosh's mother's house. (Pet. Objections (Dkt. No. 21) at 29) Cindy testified on direct examination, however, that she had smoked marijuana during the drive from Connecticut to McIntosh's mother's home in New York. (Trial Tr. (Dkt. No. 27) at 284-86) Moreover, defense counsel questioned Cindy at some length about her marijuana use on the day of the incident and generally:

Q:   Now, Cindy, you smoke marijuana, right?

A:   Yes.

Q:   You also do cocaine, do you not?

A:   No. I don't do cocaine, never done it in my life.

Q:   How about crack you were selling on the street?

A:   I never did crack. The only drug I ever did was smoke weed and cigarettes and one time, I had a couple of, I smoked, I mean I drunk alcohol.

Q:   Had you smoked any weed on the day that this happened?

A:   Um, yes, while I was with him.

Q:   No, before you got into the car?

A:   Um, like 8 o'clock in the morning, yes.

Q:   How much – how often do you think you smoked marijuana usually about that time, in May of 2001?

A:   It depends if I have enough money for it.

Q:   Well, assuming you have money for it, how often would you smoke?

A:   Like, me buying it or if somebody offers it to me?

34

Q:     Either way.

A:     Two or three times a day.

(Id. at 326-27)  McIntosh has not shown that his counsel was constitutionally ineffective in failing to ask additional questions concerning Cindy's marijuana use.

McIntosh also argues that his lawyer should have impeached Cindy's testimony that she "only sold marijuana to her friends" by introducing a prior written statement in which she stated that she approached the SUV to sell marijuana and did sell marijuana to McIntosh. (Pet. Objections (Dkt. No. 21) at 29-30)  Given that Cindy admitted that she sold crack and had been arrested for selling crack, and sold marijuana to friends, the additional impeachment value of demonstrating that she also sold marijuana to strangers appears slight. (Trial Tr. (Dkt. No. 27) at 309-10, 314-15)

McIntosh also complains that his lawyer did not use "the absence of forensic evidence [to] undermine[] Cindy's allegations and bolster[] McIntosh's." (Pet. Objections (Dkt. No. 21) at 30)  The negative "CrimeScope" evidence was laid before the jury, however. (Trial Tr. (Dkt. No. 28) at 388)  Moreover, as McIntosh concedes, his lawyer made repeated references throughout the trial to the fact that the prosecution had not introduced forensic evidence. (See Pet. Objections (Dkt. No. 21) at 30)

McIntosh further complains that his lawyer failed to introduce documents that "suggest that Cindy's rape allegations may have been the product of police suggestion." (Id. at 31)  This argument was not presented to the state courts, however, and thus cannot be considered by this Court. See Sweet v. Bennett, 353 F.3d 135, 139 (2d Cir. 2003).  Where a habeas petitioner has "'failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the

35

claims procedurally barred,' federal habeas courts also must deem the claim procedurally barred." Id. (quoting Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)).

Here, if McIntosh were to return to state court, he would not be able to pursue an ineffective assistance claim based on this theory, because he is not permitted to file a second direct appeal now that his conviction has become final under New York law. See Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991); N.Y. Ct. R. § 500.20. Moreover, because McIntosh could have included this issue in his original appeal, he cannot file a motion for collateral review. N.Y. Crim. Proc. Law § 440.10(2)(a). Accordingly, this claim is procedurally barred for purposes of federal habeas review. See Sweet, 353 F.3d at 139-40.

McIntosh also complains that his lawyer incorrectly argued in summation that hospital records in evidence would prove his story and disprove Cindy's. (Pet. Objections (Dkt. No. 21) at 31) Judge Maas found that Justice Marcus's reasonably determined that the impact of this error was de minimis. (R & R (Dkt. No. 11) at 44-45) The objection that McIntosh makes to this finding is mere speculation.

None of McIntosh's complaints about his lawyer's use of discovery materials demonstrates that the lawyer was constitutionally ineffective.

## D. Failure to Exploit Insufficiency of the Evidence

McIntosh objects to Judge Maas's finding that trial counsel did not unreasonably fail to make sufficiency arguments regarding the kidnapping and attempted witness-elimination murder counts. (Pet. Objections (Dkt. No. 21) at 32) McIntosh states that he objects "for the reasons discussed in his [previously filed] memorandum of law." (Id.)

Where a habeas petitioner files "'merely perfunctory responses' . . . in an attempt to 'engage the district court in a rehashing of the same arguments set forth in the original

36

petition,'" review for clear error, not de novo review, is appropriate. Ortiz v. Barkley, 558 F.

Supp. 2d 444, 451 (S.D.N.Y. 2008) (quoting Vega v. Artuz, No. 97Civ.3775LTSJCF, 2002 WL

31174466, at *1 (S.D.N.Y. Sept. 30, 2002)). A party is not permitted to take "'a second bite at

the apple by simply relitigating a prior argument.'" DiPilato, 662 F. Supp. 2d at 339 (quoting

Pinkney v. Progressive Home Health Servs., No. 06 Civ. 5023(LTS)(JCF), 2008 WL 2811816, at

*1 (S.D.N.Y. July 21, 2008)).

   In his R & R, Judge Maas explains that the defense's "consent" theory at trial

could have been undermined by arguing that certain jurisdictional prerequisites had not been

met. Judge Maas then went on to quote Justice Marcus's opinion concerning this issue:

> "The technical argument [McIntosh] now insists trial counsel should have made
> to the jury – that the rapes, kidnapping and attempted murder[] were all part of
> one criminal incident – may have only served to confuse the issues he had so
> carefully tried to narrow for the jury, and might inadvertently have left the jurors
> with the unintended suggestion that he was conceding the possibility that
> [McIntosh] had committed rape, kidnapping and attempted murder, albeit not in
> the first degree. Asking the Court to find that this choice constitutes ineffective
> assistance of counsel is inviting the Court to engage in exactly the type of second-
> guessing that is specifically to be avoided in determining whether a defendant
> received ineffective assistance of counsel at trial."

(R & R (Dkt. No. 11) at 46 (quoting Pet. Appendix (Dkt. No. 14) at A 157-58)) This Court

agrees with Judge Maas that the state courts did not unreasonably apply Strickland in concluding

that counsel's decision not to argue the jurisdictional issue to the jury was within the realm of

reasonable strategic decisions.

   Judge Maas also rejected McIntosh's argument that the state courts erred in

concluding that trial counsel had not been ineffective in failing to move to dismiss the first

degree attempted witness-elimination murder and kidnapping charges at trial, rather than at

sentencing. (Id.) Judge Maas explained that, because Justice Marcus and the Appellate Division

concluded that there was sufficient evidence to sustain convictions on both counts, McIntosh

suffered no prejudice from counsel's decision to raise the issue at sentencing rather than at trial. (Id. at 46-47)

Rather than address Judge Maas's findings directly, McIntosh contends that there is a "fundamental inconsistency" in the State's theory that he could be subject to New York jurisdiction for the first-degree kidnapping charge – because the kidnapping was a single, continuing crime – and guilty of witness-elimination murder, because the attempted murder was temporally and geographically separate from the rapes. (Pet. Objections (Dkt. No. 21) at 32-33; see Pet. Br. (Dkt. No. 3) at 101)  McIntosh cites no law in support of this argument, however.  In any event, there is no inconsistency:  the evidence supports a finding that – while McIntosh kidnapped Cindy with the intent to sexually abuse her for the entire period of May 19 to May 20, 2001 – there was a break between the specific acts of rape that occurred in Connecticut and McIntosh's attempt to strangle Cindy – the witness to those rapes – nearly one day later in New York.

### E.    Failure to Request a Limiting Instruction

In his petition, McIntosh argued that his lawyer was ineffective in failing to request a limiting instruction regarding the jury's consideration of "uncharged, but highly inflammatory, alleged sex crimes" for purposes other than establishing McIntosh's intent to sexually abuse Cindy in connection with the first degree kidnapping charge. (See Pet. Br. (Dkt. No. 3) at 74, 102)  In rejecting McIntosh's argument, Judge Maas explained that the sexual assaults in Connecticut were also relevant to the "'crime committed on a prior occasion' element of murder in the first degree," and McIntosh had "failed to explain why the prosecutor was not entitled to press this theory." (R & R (Dkt. No. 11) at 48)  Judge Maas also noted that Justice Marcus had instructed the jury that "McIntosh's 'prior . . . criminal conduct [is] not evidence of

[his] guilt in this case,'" and the jury must be presumed to have followed that instruction. (Id. at 48 (citing Trial Tr. (Dkt. No. 16) at 737-38; Blueford v. Arkansas, 132 S. Ct. 2044, 2051 (2012)) McIntosh objects to this finding in the R & R "for the reasons stated in his memorandum of law." (Pet. Objections (Dkt. No. 21) at 33)

This Court finds no error in Judge Maas's determination.

## F.   Failure to Object to Court's Charge on Motive

McIntosh also objects to Judge Maas's determination that his lawyer was not ineffective in "failing to object to the court's instruction that motive was not an element of any of the crimes, and that the prosecution did not have to prove that he had a reason to commit any of the crimes. . . ." (Pet. Objections (Dkt. No. 21) at 33) McIntosh argues that the jury was erroneously instructed that "they could consider any evidence of motive as tending to establish his guilt of a crime[] without requiring that they hold that evidence to the standard of proof beyond a reasonable doubt." (Id.) McIntosh makes no new arguments in support of his objection, but merely restates arguments made in his petition. (Id.)

In his petition, McIntosh challenges the jury instructions regarding the attempted murder witness-elimination charge, which has as an element that McIntosh attempted to murder Cindy in order to prevent her from testifying against him in a criminal proceeding. (Pet. Br. (Dkt. No. 3) at 102-03)

Justice Marcus's jury charge includes the following general instructions regarding motive and intent:

> While, when a person engages in conduct, his intent concerns what result he means his conduct to have, motive is the reason or reasons which lead him to engage in conduct. While intent is an essential element of the crimes charged, motive is not an element of any one of them.

In other words, the People have no obligation to prove that the defendant had a reason or reasons to commit a crime.

Nevertheless, if the evidence establishes that the defendant did have a motive to commit a crime or that he did not have a motive, you may consider that motive or lack of a motive in your deliberations.

For example, if you find from the proof that the defendant had a motive to commit a charged crime, that's a circumstance you may wish to consider as tending to establish his guilt of that crime.

On the other hand, if you find that the proof establishes the defendant had no motive to commit a charged crime, that's a circumstance you may wish to consider as tending to establish the defendant was not guilty of that crime.

(Trial Tr. (Dkt. No. 16) at 744-45; see also R & R (Dkt. No. 11) at 49-50)

With respect to the attempted murder witness-elimination charge regarding Cindy, however, Justice Marcus instructed that the jury had to find that McIntosh's acts were committed "for the purpose of preventing the intended victim's testimony in any criminal action or proceeding. . . ." (Trial Tr. (Dkt. No. 16) at 754-55; id. at 756 ("in order for you to find the defendant guilty [of the crime of attempted murder witness-elimination regarding Cindy], the People are required to prove . . . beyond a reasonable doubt each of the following elements:" (1) "that on or about May 20, 2001, in the County of the Bronx the defendant strangled Cindy"; (2) "that the defendant did so with intent to cause the death of [Cindy]"; (3) "that [Cindy] was a witness to a crime committed on a prior occasion"; (4) "that the defendant attempted to cause the death of [Cindy] for the purpose of preventing her from testifying in a criminal action or proceeding. . . ."); R & R (Dkt. No. 11) at 50)

Judge Maas noted that after the jury requested a copy of the court's charge concerning each count, Justice Marcus repeated, inter alia, his instruction that the attempted murder witness-elimination charge involving Cindy required proof that McIntosh had intended to cause Cindy's death "for the purpose of preventing the intended victim's testimony in any

40

criminal action or proceeding." (R & R (Dkt. No. 11) at 50; Trial Tr. (Dkt. No. 29) at 790-96)

Justice Marcus repeated this instruction yet again in response to another note from the jury.

(Trial Tr. (Dkt. No. 29) 809-12)  Judge Maas concluded that under these circumstances,

"McIntosh cannot show that he suffered any prejudice as a consequence of the trial court's

earlier generic motive charge." (R & R (Dkt. No. 11) at 51)

This Court finds no error in Judge Maas's determination.

## G.    Cumulative Prejudicial Effect

Finally, McIntosh objects to Judge Maas's alleged failure to consider "the totality

of the evidence and the cumulative prejudicial effect of counsel's errors and omissions." (Pet.

Objections (Dkt. No. 21) at 33-34 (citing Elmore v. Ozmint, 661 F.3d 783, 868 (4th Cir. 2011))

In Elmore, the Fourth Circuit found that trial counsel's "gross failure" to conduct any

independent investigation into the forensic evidence introduced by the State constituted

ineffective assistance that had "a palpably adverse effect on the defense." Elmore, 661 F.3d at

851, 853-54.

Here, as discussed above, Judge Maas concluded that trial counsel's performance

indicates that he had conducted an appropriate investigation and review of the prosecution's

evidence.  Moreover, counsel's decisions not to pursue forensic evidence or expert testimony

were the result of strategic considerations.  In short, McIntosh's convictions are the result not of

his lawyer's incompetence, but instead reflect the overwhelming evidence of his guilt.

## CONCLUSION

For the reasons stated above, this Court's adopts Judge Maas's recommendation

that McIntosh's petition for a writ of habeas corpus be denied.  Moreover, no certificate of

appealability will issue under 28 U.S.C. § 2253(c)(1)(A).  This Court certifies under 28 U.S.C.

41

§ 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. Cf. Coppedge v. United States, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a non-frivolous issue). The Clerk of the Court is directed to close this case.

Dated: New York, New York
October 19, 2016

SO ORDERED.

Paul G. Gardephe
United States District Judge

42